**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 16 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WILLIAM PRICE CURTIS,

       Plaintiff-Appellant,

v.

OKLAHOMA CITY PUBLIC
SCHOOLS BOARD OF EDUCATION,
Independent District No. 89,
Oklahoma County, Oklahoma;
ARTHUR STELLER, Superintendent,
in his individual and official capacity;
KAY FLOYD; LEO HISE; FRANK
KELLERT, individually and in their
official capacities as members of the
Board of Education of the Oklahoma
City Public Schools; THELMA
PARKS; OREAL PEAK, in their
official capacities as members of the
Board of Education of the Oklahoma
City Public Schools; BETTY HILL;
MICHAEL FOGERTY, in their
individual capacities; GLORIA
GRIFFIN, in her individual and
official capacity; SYLVIA LITTLE,

       Defendants-Appellees.

No. 96-6134

Appeal from the United States District Court
for the W. District of Oklahoma
(D.C. No. CV-92-2059)

Janell M. Byrd, NAACP Legal Defense and Educational Fund, Inc., Washington, D.C., (Elaine R. Jones, Director-Counsel, Theodore M. Shaw, Associate-Director, Judith A. Browne and Peter Rundlet, NAACP Legal Defense and Educational Fund, Inc., Washington, D.C., and Steven M. Angel, Kline & Kline, Oklahoma City, Oklahoma, on the briefs) for Plaintiff-Appellant.

Tammy T. Carter, Oklahoma City Public Schools, Oklahoma City, Oklahoma, for Defendant-Appellee, Oklahoma City Public Schools Board of Education No. 89.

Laura L. Holmes, The Center for Education Law, Oklahoma City, Oklahoma, for Defendant-Appellee, Oklahoma City Public Schools Board of Education No. 89; Defendants-Appellees Floyd, Hise, Kellert, Parks, Peak, Hill and Fogerty.

Robert W. Nelson, Nelson, Sherwood & Brown, Oklahoma City, Oklahoma (Michael N. Brown with him on the brief), for Defendants-Appellees, Steller, Griffin, and Little.

Before **SEYMOUR, LOGAN,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

Plaintiff William Price-Curtis filed this action against the Board of Education of the Oklahoma City Public Schools ("Board"); certain members of the Board acting in their individual capacities ("Board Members"); and Arthur Steller (former Superintendent of the Oklahoma City Public Schools), Sylvia Little (former Assistant Superintendent and supervisor of Plaintiff), and Gloria

Griffin (supervisor of Plaintiff), in their individual and official capacities

(collectively, "Supervisors").[1]

Plaintiff alleged he suffered harassment and retaliation and was ultimately

discharged from his position as Equity/Affirmative Action Officer for the

Oklahoma City Public Schools ("School District"), in violation of federal and

state law. He appeals various rulings of the district court and a portion of the

adverse jury verdict. This court concludes the district court improperly ruled that

certain of Plaintiff's expressions relating to racial equity within the school district

were not protected under the First Amendment for purposes of Plaintiff's civil

rights and retaliatory discharge claims. We affirm on all other issues.

## I. FACTS

### A. Background of the *Dowell* Litigation

An overview of the efforts to desegregate the Oklahoma City public schools

is necessary for a complete understanding of this case. In 1961, Oklahoma

schoolchildren and their parents commenced an action seeking equitable relief

against the Board for operating a state-imposed dual system of education. *See*

---

[1]The Board is the governing and policy-making body for the Oklahoma City Public Schools ("School District"). *See* Okla. Stat. Ann. tit. 70, § 5-106. It also has final authority in hiring and discharging employees. The Superintendent is hired by the Board to take care of the day-to-day operations of the School District. The Superintendent's duties include the direct supervision of staff and making employment/termination recommendations to the Board.

*Dowell v. School Bd.*, 219 F. Supp. 427 (W.D. Okla. 1963). In 1963, a federal district court held that the Board had intentionally segregated its schools. *See id.*; *see also Board of Educ. v. Dowell*, 498 U.S. 237, 240 (1991).

In 1972, after finding that the Board's operational plans failed to eliminate the state-imposed segregation, the district court ordered the Board to implement a desegregation plan. *See Dowell v. Board of Educ.*, 338 F. Supp. 1256, 1271-73 (W.D. Okla. 1972). The court-ordered desegregation plan restructured Oklahoma City's school attendance zones to create racial balance by requiring, *inter alia*, that black children be bused to formerly white schools. *See id.* at 1273.

In 1975, the Board filed a motion to end the federal court's jurisdiction. In 1977, the district court found that the Board had executed the desegregation plan properly and that "'substantial compliance with the constitutional requirements ha[d] been achieved.'" *Dowell*, 498 U.S. at 241 (quoting No. CIV-9452 (W.D. Okla. Jan 18, 1977)). The court therefore relinquished its jurisdiction over the case, ending its supervision over the Board. *See id.* at 242. The court did not, however, vacate its 1972 decree mandating implementation of the desegregation plan. *See Dowell v. Board of Educ.*, 8 F.3d 1501, 1505 (10th Cir. 1993).

The Board continued to operate its schools in substantial conformity with the 1972 court-ordered desegregation plan until 1985, when the Board adopted the Student Reassignment Plan ("SRP"). *See id.* at 1505-06. Under the SRP, a

number of previously desegregated schools were returned to primarily one-race status for the asserted purposes of increasing parental involvement and alleviating greater busing burdens on young black children caused by demographic changes. *See Dowell*, 498 U.S. at 242. The SRP returned students in grades 1-4 to neighborhood schools, although busing continued for all students above the fourth grade. *See id.* Under the SRP, 11 of the 64 elementary schools became more than 90% black, 22 became less than 10% black, and 31 remained racially mixed. *See id.*

The SRP also included a "number of programs designed to preserve to the maximum extent possible the desegregated nature of the school system." *Dowell v. Board of Educ.*, 778 F. Supp. 1144, 1189 (W.D. Okla. 1991). These programs included the appointment of an "Equity Officer" and an "Equity Committee" to "monitor the quality of facilities, equipment, supplies, and instructors throughout the school system and to recommend other means of integrating racially identifiable elementary schools." *Dowell*, 8 F.3d at 1506.

After the Board adopted the SRP, the plaintiffs in the original *Dowell* litigation challenged the SRP in court, seeking to reopen the *Dowell* case and enjoin the Board from implementing the SRP. *See Dowell v. Board of Educ.*, 606 F. Supp. 1548 (W.D. Okla. 1985). The *Dowell* plaintiffs contended the School District had "not achieved 'unitary' status and that the SRP was a return to

segregation." *Dowell*, 498 U.S. at 242. This later phase of the *Dowell* litigation continued through 1993, when, following several appeals and remands, including an appeal to the Supreme Court, *see Dowell*, 8 F.3d at 1505-07, 1505 n.2, this court affirmed the district court's 1991 ruling dismissing the case. *See id.* at 1520. In rejecting the *Dowell* plaintiffs' request for relief, the district court found that the Board was entitled to have the 1972 desegregation decree dissolved and that the SRP was adopted without discriminatory intent and satisfied equal protection standards. *See Dowell*, 778 F. Supp. at 1179-96.

## B. Plaintiff's Experience as Equity/Affirmative Action Officer

The events leading up to Plaintiff's discharge in January 1991 took place during the *Dowell* litigation. In 1987, Plaintiff was employed as the Equity/Affirmative Action Officer for the Oklahoma City Public Schools. Plaintiff's "job goals" included assisting the School District in achieving equity under the SRP and "generally, facilitating the creation of a model school system." Plaintiff was to achieve these goals in part by "facilitating" the Equity Committee ("Committee") and serving as a "communication link" between the Committee, Board, and the Superintendent of the School District.[2]

_____

[2]Plaintiff's position combined two positions, Equity Officer and Affirmative Action Officer, formerly filled by two employees. According to the job description, the specific responsibilities of the Equity/Affirmative Action Officer included developing and implementing the District's affirmative action and equity programs; facilitating the Affirmative Action and Equity Advisory

Superintendent Arthur Steller was Plaintiff's immediate supervisor for most of 1988 and the beginning of 1989. Plaintiff's first two performance evaluations, prepared by Steller in July 1988 and August 1989, were generally favorable.

In early 1989, Sylvia Little became Plaintiff's immediate supervisor. Plaintiff experienced a number of conflicts with Little and began to receive written reprimands and other criticisms of his performance from Little. Defendants assert these disciplinary actions resulted from Plaintiff's failure to meet deadlines and follow directives. Plaintiff contends the disciplinary actions were retaliatory. Plaintiff also asserts Little interfered with his efforts to facilitate the Equity Committee, undermined his work product, and gave him job assignments not required of other administrators.

On September 25, 1989, Plaintiff testified at a hearing before the Board on behalf of a colleague, Belinda Biscoe, who alleged she had been subjected to harassment and salary discrimination by Steller. At this hearing, Plaintiff testified about several incidents manifesting his belief Steller had harassed

_____

Committees "so that the purposes of these groups [would be] achieved"; serving as a "communication link" between the committees, Board, and Superintendent; receiving, investigating, and participating in the resolution of discrimination complaints; "[v]isit[ing] school sites to compare facilities, equipment, supplies and other material resources and, otherwise, explor[ing] equity issues"; and "serv[ing] as the District's liaison with civil rights compliance agencies, minority and women's organizations, and other community groups concerned with equal employment opportunities and equity." In the spring of 1989, Plaintiff was assigned the additional job duty of minority teacher recruitment.

Biscoe. He further testified that he had also been harassed by Steller after certain Board Members and members of the African American community expressed concern about the equity of both his and Biscoe's salaries.

On November 14, 1989, Plaintiff was placed on a Plan for Improvement ("PFI"), a vehicle to correct his alleged performance deficiencies. Plaintiff asserts this was in retaliation for his testimony at the Biscoe hearing. In January 1990, Plaintiff was subpoenaed and gave testimony to a grand jury investigating the School District. In March 1990, Plaintiff filed a racial discrimination and harassment charge with the EEOC.

In June 1990, Little recommended to Steller that Plaintiff's contract not be renewed "based upon willful neglect of duty." Steller did not approve the recommendation. In July 1990, Plaintiff received his annual performance evaluation from Little, in which he received an "unsatisfactory" rating. Plaintiff was placed on another PFI, with a recommendation that he be discharged if all the conditions delineated in the PFI were not met.[3]

### C. Background of the Equity Committee Charge and the Committee's 1988-89 Equity Report

---

[3]Throughout 1990, Gloria Griffin acted as Plaintiff's supervisor during Little's absences. Plaintiff also experienced conflicts with Griffin and received a number of written reprimands from Griffin based on his alleged failure to meet deadlines and satisfactorily complete certain job responsibilities and on his allegedly unprofessional behavior.

The Equity Committee was an advisory committee composed of lay persons appointed by the Board. According to official Board policy, such advisory committees were established to assist the Board in research projects and in developing policies. The committees were to "serve in an advisory capacity only, proposing recommendations based on analysis of a problem." Oklahoma City Public Schools, Policy B-16. Although the Board was to "give careful consideration to all [committee] recommendations," the Board retained final responsibility over any proposed actions. *Id.*

In 1985, the Board provided the Equity Committee and Equity Officer with a definition of equity and an official charge ("1985 charge"). "[E]quity in education" was defined as: "An educational system which provides equal education opportunities for all children." Under the 1985 charge, the Committee was primarily directed to inspect physical facilities and equipment and to review pupil-teacher ratios to determine whether there was equity in the district.

According to Plaintiff, in response to the frustration expressed by the Committee concerning its ability to adequately review equity in the schools based on such inspections, Plaintiff organized a workshop for the Committee with an equity consultant in 1988. As a result of the workshop, the Committee broadened its view of school equity and expressed a desire to review more substantive measurements of equity, rather than focusing primarily on physical facilities and

equipment. From the fall of 1988 through 1989, the Board, Committee, Plaintiff, and School District Administration discussed revising the 1985 charge. The Board and Committee exchanged drafts of proposed revisions to the 1985 charge. The Committee's proposals recommended examining substantive factors for measuring equity, such as test scores and level of teacher experience.

On December 4, 1989, the Board officially adopted a new charge ("1989 charge").[4] The general directive of the 1989 charge stated that the Equity Officer and Committee were "appoint[ed] and charge[d] . . . with ensuring that black [students] and students of other racial groups are not adversely affected as a result of the Board's 1985 adoption of a Student Reassignment Plan." The 1989 charge then directed the Equity Officer and Committee to (1) review facility upkeep and availability of instructional materials at a representative sample of elementary schools within each of the Board's sub-districts; (2) evaluate equity in school adoptions, tutorial programs, and parental and community support; (3) review data of individual elementary schools, concentrating on pupil-teacher ratios, educational attainment of teachers, level of experience of teachers, and standardized test performance; (4) review other areas of equitable concern as the

_____

[4]During the December 4 Board meeting and other meetings, Plaintiff argued that the Committee should be allowed to review test scores and also argued that in light of the *Dowell* litigation the Committee should focus on the "*Dowell* schools" (the 90%+ black schools created as a result of the SRP).

-10-

Board may direct; (5) make annual reports to the Board; and (6) make recommendations to the Board as deemed necessary.

After receiving the 1989 charge, the Equity Committee, with Plaintiff's assistance, developed a "Blueprint for Equity," which was used to direct the Committee in implementing the charge and preparing the Committee's report for the 1989-90 school year. Based on Plaintiff's recommendation, the Blueprint focused on equity in the "*Dowell* schools" (the 90%+ black schools created as a result of the SRP). The Blueprint also identified a number of substantive factors to be studied in the equity review.

In September 1990, the Committee issued its report on equity in the district for the 1989-90 school year. This report, which followed the Blueprint, compared the *Dowell* schools to a group of schools in the district which were more racially integrated or predominantly white. The report concluded the *Dowell* schools were generally "worse than" the group of comparison schools based on several factors and made recommendations to improve the *Dowell* schools.[5]

In a memorandum to the Board responding to the Committee report, Superintendent Steller criticized the report as inconsistent with the Board's 1989

_____

[5]The report also charged that the School District Administration interfered with and failed to cooperate with the Committee. The report indicated that such interference included the cancellation of a scheduled equity workshop, Sylvia Little's disruption of Committee meetings, and the Administration's failure to respond to Committee requests for data.

charge.[6]  Under the 1989 charge, the Committee was to monitor all sub-districts to determine if students of all racial and ethnic backgrounds were receiving equity. The Committee's report, however, focused on equity only in the *Dowell* schools. The report also examined a number of different factors than those set out in the 1989 charge.  Steller further stated that the Committee had employed faulty and outdated data in reaching its conclusions.  Steller expressly rejected the Committee's conclusion that the *Dowell* schools were deficient in contrast to the group of comparison schools.  Steller further suggested the Committee was biased and stated that "[t]he timing of this report [was] . . . suspiciously close to the date when the oral arguments [were] to be heard [in the *Dowell* litigation] by the U.S. Supreme Court [in October 1990]."

At the subsequent Board meeting when the Committee's report was presented, the Board discussed and then voted five to one to reject the report's findings on the grounds that "the report [did] not address the charge given to the Committee by the Board" and "the data [was] faulty and [was] not based on current progress of the schools."

---

[6]In addition to his letter describing problems with the Committee's report, Steller provided the Board with a specific outline of how the report was inconsistent with the Board's 1989 charge.  Such inconsistencies included the report's failure to address "all racial or ethnic groups," failure to visit all the schools listed in the report, failure to rely on "authoritative data," failure to select a "representative" group of schools for review, and failure to address parental and community support.

## D. Plaintiff's Termination

On November 1, 1990, Little recommended Plaintiff's dismissal to Steller. On November 6, Steller notified Plaintiff in writing that he was recommending to the Board that Plaintiff be discharged for "willful neglect of duty and incompetence." The reasons cited for the discharge recommendation included Plaintiff's alleged failure to guide the Equity Committee to a "Blueprint for Equity" consistent with the Board's 1989 charge "and/or appropriately notify [his] immediate supervisor when it became apparent the Committee was not following the Charge."[7] Steller subsequently sent a letter to the Board containing his recommendation and an outline of the reasons and supporting evidence.

A pretermination hearing before the Board was scheduled for January 19, 1991. Plaintiff informed the Board that he believed the hearing should not proceed until the EEOC had resolved his discrimination complaint and informed

---

[7]The letter notifying Plaintiff of this recommendation stated that Plaintiff had failed to "fulfill Performance Responsibilities in [his] position as Equity/Affirmative Action Officer" and failed to "meet the objectives of [his PFI]." The letter then outlined specific job performance failures, including his "[f]ailure to guide the Equity Advisory Committee to use the proper statistical information in the Committee's annual report for the 1989-90 school year"; "[f]ailure to communicate with and guide the Equity Advisory Committee to correct unfounded and inaccurate allegations and statements in the Committee's report for the 1989-90 school year"; and "[f]ailure to submit . . . Affirmative Action Plans in accordance with Board Policy . . . [and] as directed." The letter further listed as grounds for termination Plaintiff's failure to satisfy sixteen of twenty-two specific objectives provided by the PFIs.

-13-

the Board that he would not attend the scheduled hearing. At the scheduled hearing, the Board voted to deny Plaintiff's request for a continuance until the EEOC acted and then voted five to two to accept Steller's recommendation and terminate Plaintiff's employment with the School District.

### E. The Litigation

In July 1992, the EEOC dismissed Plaintiff's discrimination complaint, and in October 1992, Plaintiff filed this action. Plaintiff alleged he was "harassed, discriminated against and ultimately terminated in an escalating pattern of retaliatory reprimands and negative evaluations." Plaintiff alleged Defendants' actions were taken in retaliation for certain of Plaintiff's activities[8] and violated the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1981, 1983, 1985; Title VII of the Civil Rights Act of 1964; and state law prohibiting retaliatory discharge and breach of contract.

In April 1995, the district court granted summary judgment to all Defendants on Plaintiff's procedural and substantive due process claims. The

---

[8]Plaintiff specifically alleged he suffered retaliation for testifying on behalf of Belinda Biscoe in a hearing charging Superintendent Steller with discrimination and harassment; "giving subpoenaed testimony to a grand jury investigating charges of mismanagement and abuse of power in the School District"; filing a complaint with the EEOC claiming racial discrimination and retaliatory harassment by his employer; and "refusing to censor the . . . Equity Committee report which revealed racial inequity in the school district at a time when [School District] officials were concerned about the outcome of the district's school desegregation case pending in the United States Supreme Court."

court also granted the Board's motion for summary judgment on the § 1983 claim and granted the Board Members' motion for qualified immunity.

A jury trial began in February 1996. At the conclusion of Plaintiff's case in chief, the district court entered judgment as a matter of law in favor of the Board and Supervisors on Plaintiff's § 1981 claim. The court also granted the Supervisors' motion for judgment as a matter of law on Plaintiff's Title VII claim and state law retaliatory discharge and breach of contract claims. Following the trial, the district court ruled in favor of the Board on the Title VII claim.[9] The jury returned a verdict in favor of Defendants on the remaining § 1983, § 1985, and state law claims.[10]

On appeal, Plaintiff argues (1) the district court erred in ruling that certain of Plaintiff's activities and speech in connection with the Equity Committee were not protected by the First Amendment; (2) the district court erred in denying Plaintiff's summary judgment motion on his due process claims; (3) the district court erred in granting summary judgment to the Board on Plaintiff's § 1983 claim; (4) the district court erred in granting judgment in favor of the Board on

[9]The court treated the Title VII claim as a non-jury trial issue because the claim arose prior to the effective date of the 1991 amendments to the Civil Rights Act, which amendments provided a right to a jury trial.

[10]Specifically, the jury returned a verdict in favor of the Board and Supervisors on the § 1985 claim, in favor of Supervisors on the § 1983 claim, and in favor of the Board on the state law retaliatory discharge and breach of contract claims.

Plaintiff's Title VII claim; (5) the district court erred in making certain evidentiary rulings at trial; (6) the district court's jury instruction concerning due process constitutes reversible error; and (7) the jury's verdict for the Board on Plaintiff's breach of contract claim was contrary to the overwhelming evidence.

## II. ANALYSIS

### A. First Amendment Protected Speech Claims

During the jury instruction conference, Plaintiff asserted that various activities in which he engaged were protected speech under the First Amendment. The district court concluded, however, that only two of the activities, Plaintiff's testimony in the Belinda Biscoe hearing and his testimony before the grand jury, were protected, and accordingly listed only these activities as protected speech in the jury instructions on Plaintiff's § 1983 claim.

On appeal, Plaintiff challenges the district court's determinations regarding two general activities: (1) Plaintiff's advocacy to the Equity Committee and Board regarding the need to examine equity by focusing on the "*Dowell* schools" (the 90%+ black schools created as a result of the SRP) and (2) Plaintiff's activities in connection with the Committee's preparation and submission of the 1989-90 equity report.[11]  Plaintiff asserts these activities were protected speech and that

---

[11]On appeal, Plaintiff appears to characterize this second category of speech as including not only his guidance to the Committee in preparing and submitting the Committee's report to the Board, but also the actual content of the 1989-90

the jury should have been allowed to consider these activities in connection with his § 1983, § 1985, and retaliatory discharge claims.[12]

## 1. Protected Speech Under the First Amendment

It is well established that a government employer may not condition employment or "discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987); *see also Connick v. Myers*, 461 U.S. 138, 142 (1983). Before the ultimate question of whether a government employer violated an employee's First Amendment rights can be resolved, the court must first

_____

report. Based on the record provided by Plaintiff, however, it is unclear whether Plaintiff asserted before the district court that the report itself was protected speech. It is also unclear whether, based on Plaintiff's testimony and position taken at trial, the report could be deemed his (and not merely the Committee's) speech. This court therefore does not consider whether the content of the report itself is protected speech.

Plaintiff also asserts that his activities in connection with the Committee's preparation of the 1988-89 equity report are protected speech. Plaintiff has not provided any argument on appeal, however, as to why this activity should be protected, nor has he explained which specific speech or activities he is relying on with respect to the 1988-89 report. This court therefore does not address Plaintiff's general assertion that his activities in connection with the 1988-89 report are protected.

[12]In addition to determining the above speech was not protected, the district court held that Plaintiff's filing of an EEOC complaint was not protected speech. The court also held that Plaintiff's guidance to the Equity Committee through the first workshop with an equity consultant and his actions in connection with the cancellation by Sylvia Little of a second workshop were not protected. Plaintiff apparently does not challenge these rulings and this court therefore does not consider these activities on appeal.

determine whether the employee's speech was constitutionally protected.  In

analyzing whether a public employee's speech is entitled to First Amendment

protection, the threshold question is whether the speech may be "fairly

characterized as constituting speech on a matter of public concern" as opposed to

speech upon matters of only personal interest.  *Connick*, 461 U.S. at 146; *see also*

*Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996).

If the speech addresses a matter of public concern, the court must then

apply the *Pickering* balancing test.  *See Pickering v. Board of Educ.*, 391 U.S.

563, 568 (1968).  Under this test, the court balances the employee's interests, as a

citizen, in commenting upon matters of public concern against the government

employer's interest in regulating the speech of its employees in order to promote

the efficiency of its public services.  *See id.*  Speech is protected if the

employee's interest outweighs the interest of the government employer.[13]

---

[13]If the court concludes that the *Pickering* balancing test tips in favor of the employee and that the expression at issue was therefore constitutionally protected, the plaintiff must then prove that the protected speech was a "substantial" or "motivating" factor in the challenged employment decision.  *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996).  "[I]f the employee makes this showing, the burden then shifts to the employer to show 'by a preponderance of evidence that it would have reached the same decision . . . even in the absence of the protected conduct.'" *Id.* (ellipses in original) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  These latter two steps involve questions of fact to be resolved by the jury.  *See id.*

Whether speech is constitutionally protected is a question of law subject to de novo review. *See Koch v. City of Hutchinson*, 847 F.2d 1436, 1441 & n.14 (10th Cir. 1988) (en banc). In determining whether Plaintiff's speech was protected, this court conducts an "'independent examination of the whole record'" to ensure that "'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Id.* at 1441 (quoting *Rankin*, 483 U.S. at 386 n.9 (internal quotations omitted)). "In assessing the status of [Plaintiff's] speech, we view the [underlying] historical facts most favorably to [Plaintiff] and give [him] the benefit of all reasonable inferences to be drawn from the evidence." *Ware v. Unified Sch. Dist. No. 492*, 881 F.2d 906, 909 (10th Cir. 1989), *modified in part*, 902 F.2d 815 (10th Cir. 1990).

For purposes of review, we separate Plaintiff's activities into two chronological categories: (1) Plaintiff's advocacy before the Equity Committee and Board to focus on the *Dowell* schools in conducting the equity review, insofar as this advocacy took place before the new equity charge was officially adopted by the Board in December 1989 ("Plaintiff's pre-charge advocacy"); and (2) Plaintiff's activities in connection with the preparation and submission of the

Committee's 1989-90 equity report, which took place after the 1989 charge was adopted ("Plaintiff's post-charge guidance").[14]

## 2. Public Concern

Speech on a matter of public concern is that which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. In determining whether the speech in question addressed a matter of public concern, we consider the "content, form, and context of [the] . . . statement[s], as revealed by the whole record." *Id.* at 147-48.

"In deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Gardetto*, 100 F.3d at 812. Speech concerning individual personnel disputes or internal policies will typically not involve public concern. *See id.* On the other hand, "'[s]peech that seeks to expose improper operations of the government or questions the integrity of government officials clearly concerns vital public

---

[14]This latter category of activity generally includes Plaintiff's guidance to the Committee concerning implementation of the 1989 charge and preparation of the Committee's equity report. The category thus includes Plaintiff's guidance and recommendations to the Committee in preparing the "Blueprint for Equity."

interests.'" *Id.* (alteration in original) (quoting *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988)).

Plaintiff characterizes his speech as a "call for a substantive investigation of racial equity under the SRP." Plaintiff also asserts his speech "focused in on [a] . . . breach of the public trust" by the Board and School District. In so arguing, Plaintiff apparently suggests he sought to inform the public both that the SRP was resulting in inequity and that Defendants were not allowing the Equity Officer and Committee to perform a meaningful review of equity in the district.

In arguing his expression addressed a matter of public concern, Plaintiff points to the context of the speech. Plaintiff's speech took place within the context of the Board's decision to end desegregation measures and return students to neighborhood schools under the SRP, which resulted in a dramatic increase in the number of schools with a student population over 90% black. In addition, Plaintiff's expression took place during the ongoing *Dowell* litigation, in which the federal courts were considering whether the Board could cease desegregation measures and be released from court supervision.

Plaintiff further argues that as the Board ended desegregation measures, the Equity Officer and Committee "ostensibly were the check provided to assure the public and the courts that the Board was acting in good faith and that racial inequity would not be allowed." Plaintiff states that courts in the *Dowell* case

-21-

identified the appointment of an Equity Officer and Committee as fundamental elements of the SRP. *See, e.g.*, *Dowell*, 606 F. Supp. at 1552. Plaintiff also asserts that "[t]heir existence as part of the plan was relied upon by the [Board] to support the SRP and was repeatedly cited as courts considered the legal challenge to the plan." *See, e.g.*, *Dowell*, 8 F.3d at 1513; *Dowell*, 890 F.2d at 1501; *Dowell*, 778 F. Supp. at 1189-90.

This court agrees that Plaintiff's speech, both his pre-charge advocacy and his post-charge guidance, involved a matter of public concern. Although the expressions took place during and as part of his official duties, Plaintiff's speech did not address matters of mere personal interest, such as working conditions or internal personnel policies. *See Gardetto*, 100 F.3d at 812. Instead, Plaintiff's speech directly concerned issues of public interest, including whether there was equity in the Oklahoma City public schools; whether the *Dowell* schools were adversely and uniquely affected by the adoption of the SRP; how the Board was to determine whether there was equity within the district; and whether the Board and Administration were allowing Plaintiff and the Equity Committee to conduct a meaningful and fair review of equity in the schools. These are matters of legitimate concern to the public, particularly given the context in which the speech took place: the ongoing *Dowell* litigation and the Board's decision to implement the SRP. Further, Plaintiff's speech on these matters was valuable in

informing the public debate over the equitable functioning of the public schools and was helpful to the public in evaluating the performance of public institutions.

### 3. *Pickering* Balancing

Having concluded Plaintiff's speech involved a matter of public concern, this court next applies the *Pickering* balancing test to determine whether Plaintiff's interest in commenting on such matters was outweighed by his government employer's interest in restricting the speech so as to promote the efficient provision of public services. *See Pickering*, 391 U.S. at 568. Under the *Pickering* test, the employee's free speech rights are protected "'unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.'" *Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986) (quoting *Childers v. Independent Sch. Dist. No. 1*, 676 F.2d 1338, 1341 (10th Cir. 1982)). Further, "[t]he employer's burden to justify its restriction on speech increases in proportion to the value of that speech in the public debate." *Ware*, 881 F.2d at 910. In conducting the *Pickering* balancing, this court considers the "manner, time, and place of the employee's expression," as well as "the context in which the dispute arose." *Rankin*, 483 U.S. at 388.

Relevant considerations in applying the *Pickering* balancing test include "whether the statement impairs discipline by superiors or harmony among co-

workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* The employee's authority and responsibilities in the workplace are also relevant to the balancing. *See Koch*, 847 F.2d at 1449-50. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin*, 483 U.S. at 390. The employee's burden of caution is greater when the employee serves in a "confidential, policymaking, or public contact role," rather than, for example, a clerical role, because of the higher likelihood the employee's speech will cause disruption to the agency's successful functioning. *Id.* at 390-91; *see also Koch*, 847 F.2d at 1449-50.

Another relevant consideration is whether the employee's speech calls into question the employee's competence to perform his or her job. *See Koch*, 847 F.2d at 1442, 1450-51. This court has held that when speech occurs in the course of the employee's official duties, it "will usually, if not always, reflect upon the employee's competence to perform his or her job" and may "frequently lead to a finding that speech is unprotected." *Id.* at 1442.

Defendants contend that Plaintiff's speech and activities, which occurred in the course of his official duties, called into question Plaintiff's competence to

perform his job responsibilities, which included facilitating the Equity Committee and acting as a "communication link" between the Committee, Board, and Administration. Defendants assert Plaintiff failed to ensure the Committee followed the Board's 1989 charge, instead directing the Committee to focus on the *Dowell* schools and to address factors different from those identified in the charge. Defendants claim this resulted in an incomplete and inaccurate account of equity in the Committee's annual report. Defendants also assert Plaintiff's actions disrupted the working relationship between Plaintiff, the Board, the Committee, and the Administration, which harmed Defendants' interest in functioning efficiently.

Plaintiff challenges the contention that his speech reflected negatively on his competence. He also argues that any disruption engendered by his speech was "licensed" by his job, which "required him to perform in a manner that his employers necessarily recognized included a likelihood of 'disruption.'"

After reviewing the record and balancing the interests of Plaintiff and Defendants, this court concludes Plaintiff's pre-charge advocacy was protected. Plaintiff's pre-charge advocacy to the Board and Committee concerning the need to focus on the *Dowell* schools did not reflect negatively upon Plaintiff's competence to do his job. Instead, the record indicates that such advocacy was

part of an ongoing discussion between the various parties concerning the role of the Equity Committee and how the equity definition and charge should be revised.

In addition, Defendants have not identified any actual disruption attributable to Plaintiff's pre-charge advocacy. *See Gardetto*, 100 F.3d at 815-16. Even assuming some conflict arose from disagreements between the parties concerning the proper approach to examining equity, Defendants have not pointed to any unreasonable or unnecessarily disruptive conduct related to Plaintiff's pre-charge advocacy. *Cf. Johnsen v. Independent Sch. Dist. No. 3*, 891 F.2d 1485, 1493-94 (10th Cir. 1989) (considering whether employee's actions were "needlessly" or "unnecessarily disruptive").

We reach a different conclusion, however, with respect to Plaintiff's post-charge guidance. Given the inconsistencies between the Board-approved charge and the Committee's Blueprint and report, *see supra* Part I.C, Defendants were entitled to consider Plaintiff's post-charge guidance to the Committee as reflecting negatively upon Plaintiff's competence and willingness to perform his job responsibilities. *Cf. Koch*, 847 F.2d at 1450-51. Further, there is evidence that Plaintiff's post-charge guidance had a detrimental impact on the working relationship between the Board, Plaintiff's Supervisors, and the Equity

Committee.[15] *Cf. id.* at 1451-52. Additionally, Plaintiff's failure to guide the Committee consistent with the charge disrupted the Board's effective and efficient functioning, manifest in the Board and Committee not coordinating their efforts based on a consistent charge and the Board's inability to rely on the Committee's report. Contrary to Plaintiff's contention, these disruptions were not of the type which could be reasonably contemplated by Defendants.

Beyond the competence and disruption factors, Plaintiff's responsibilities and position in the workplace weigh against protection of Plaintiff's post-charge expression. Plaintiff was involved in the development and implementation of policies for the School District, and Plaintiff's job responsibilities involved significant contact with the public. *Cf. id.* at 1452-53; *see also supra* note 2 (describing duties). Consequently, Plaintiff's burden of caution with respect to his speech was high and Defendants had a "greater interest in considering his speech when making an employment decision." *Koch*, 847 F.2d at 1453.

Based on the above factors, this court concludes Defendants' interests outweigh Plaintiff's interests with respect to Plaintiff's post-charge guidance and

_____

[15]For example, at the Board meeting when the report was presented, both Board and Committee members expressed frustration over the situation resulting from their contrary understandings of the Committee's role and compliance with the Board's charge.

this speech is therefore not constitutionally protected. Plaintiff's pre-charge advocacy, however, is entitled to First Amendment protection.

## B. Due Process Claims

Plaintiff next argues the district court erred in denying his motion for summary judgment against the Board on his due process claims. This court reviews summary judgment orders de novo, using the same standards employed by the district court under Fed. R. Civ. P. 56(c). *See Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether a genuine issue of material fact exists, the court must draw all reasonable inferences in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255.

Plaintiff was notified by letter in November 1990 that Steller was recommending to the Board that Plaintiff be terminated for "willful neglect of duty and incompetence."[16] The letter outlined specific job performance

---

[16]According to District policy, employees "may be dismissed from employment with the district for just cause" and "are entitled to procedural due process related to . . . dismissal." Oklahoma City Public Schools, Policy G-31

requirements and PFI objectives Plaintiff allegedly failed to meet and informed Plaintiff that he could request a pretermination hearing before the Board. Steller subsequently sent a letter to the Board containing his recommendation and listing specific reasons and evidence supporting the recommendation.

The Board scheduled a pretermination hearing for January 19, 1991. Plaintiff's attorney informed the Board that Plaintiff had filed an EEOC complaint and believed the pretermination hearing should be continued until the EEOC acted on the complaint. Plaintiff was informed by letter that he must attend the scheduled hearing "to present [his] motion for a continuance, and be prepared to proceed with [his] case if the Board . . . does not grant the continuance." After receiving this letter, Plaintiff informed Defendants he would not attend the hearing and again asserted the hearing should be continued.

On January 19, Plaintiff's pretermination hearing was held. Plaintiff did not attend the hearing. The Board first considered Plaintiff's request for a continuance and after discussion voted to deny the request. The Board then proceeded to consider Steller's discharge recommendation. The Board discussed whether there was a need to take evidence given that Plaintiff did not attend the hearing, and also noted that Steller's recommendation to the Board contained the grounds for the termination recommendation and a summation of the evidence to

_____

(Aug. 7, 1989).

support those grounds. Following its discussion, the Board voted to accept Steller's recommendation to terminate Plaintiff.

Plaintiff asserts the Board's decision to terminate his employment violated substantive due process. "In order to present a claim of denial of 'substantive' due process by a discharge for arbitrary or capricious reasons, a liberty or property interest must be present to which the protection of due process can attach." *Brenna v. Southern Colo. State College*, 589 F.2d 475, 476 (10th Cir. 1978). Plaintiff asserts he had a property interest in continued employment, as established by state law and Board policy.[17] Assuming a protected property interest, "'[s]ubstantive' due process requires only that termination of that interest not be arbitrary, capricious, or without a rational basis." *Id.* at 477. "The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 350 (1976).

---

[17]In ruling on Plaintiff's procedural due process claims, the trial court determined Plaintiff had a protected property interest in continued employment. Although this interest is protected by procedural due process, it is unclear whether the interest is also protected by substantive due process. Neither the Supreme Court nor this court has determined whether a state law contract right is a property right entitled to the protection of substantive due process. *See Archuleta v. Colorado Dep't of Insts.*, 936 F.2d 483, 489 n.6 (10th Cir. 1991). Because we conclude Plaintiff failed to establish a genuine issue of material fact whether the Board acted arbitrarily and capriciously in voting to terminate his employment, we need not determine whether he had a property interest entitled to substantive due process protection.

In arguing he was denied substantive due process, Plaintiff notes that at the pretermination hearing the Board did not receive any evidence, did not discuss the specific grounds for Steller's recommendation, and did not state any reasons on the record for the Board's decision to accept the recommendation. Plaintiff further asserts that several Board members admitted in depositions that they did not make an independent determination concerning the specific charges contained in Steller's recommendation. Plaintiff concludes this demonstrates the Board "terminated him without reason," rendering its decision arbitrary and capricious.[18]

Plaintiff has not established a genuine issue of material fact underlying his substantive due process claim. Although several Board members indicated in depositions that they did not make an independent determination on the merits of Steller's charges against Plaintiff, these statements, placed in context, do not

---

[18]Plaintiff alternatively asserts the Board terminated him because he did not attend the pretermination hearing. Plaintiff then asserts that the Board decision based on his non-attendance violated his procedural due process rights because he was not given advance notice that failure to attend the hearing would constitute grounds for termination or would waive his right to continued employment absent "just cause" for discharge. In support of this argument, Plaintiff states that two Board members admitted in depositions that they voted for termination solely because Plaintiff did not attend the hearing. Placed in context, however, the testimony Plaintiff relies on does not support this assertion. Instead, the Board members stated they voted to discharge Plaintiff because, given Plaintiff's failure to attend the hearing, they had no other facts besides those presented in Steller's recommendation upon which to base their decision. One of these Board members further indicated he believed that because Plaintiff chose not to appear, it was possible he "did not want the evidence presented" or "made public." This court therefore rejects Plaintiff's procedural due process claim.

support Plaintiff's claim that the Board terminated him for no reason. Instead, the record establishes that in the absence of any evidence presented by Plaintiff at the hearing or otherwise in writing to dispute the statements in Steller's letter recommending termination, the Board decided to accept Steller's recommendation.

The transcript of the hearing indicates the Board members had received Steller's letter recommending termination and listing reasons and supporting evidence. The fact that the Board members relied on Steller's evaluation and referenced supporting evidence in voting to terminate Plaintiff does not render the Board's decision arbitrary or capricious. Further, under the circumstances, the Board was not required, as Plaintiff suggests, to restate the specific reasons and evidence contained in Steller's recommendation before voting to accept the recommendation. The district court therefore properly granted summary judgment to Defendants on the Plaintiff's due process claims.

### C. Section 1983 Claim

Plaintiff next asserts the district court erred in granting the Board's motion for summary judgment on his § 1983 claim. The Board, as the final policy-making authority under state law, may not be held liable under § 1983 based on the doctrine of respondeat superior. *See Ware v. Unified Sch. Dist. No. 492*, 902 F.2d 815, 819 (10th Cir. 1990). Instead, to state a § 1983 claim against the

Board, Plaintiff must establish a "direct causal link" between the Board's actions and the alleged constitutional deprivation. *Id.* This can be established by showing that the Board "exercised its decisionmaking authority with deliberate indifference to the constitutional rights" of Plaintiff. *Id.*

In *Ware*, this court stated that "[s]chool boards are chargeable with the knowledge that employees 'may not be dismissed in retaliation for lawful exercise of first amendment freedoms.'" *Id.* (citation omitted). Plaintiff asserts that the record here establishes the Board knew of his belief that Steller's recommendation was made in retaliation for Plaintiff's protected activity. Plaintiff argues that in light of this knowledge, the Board's decision to vote in favor of termination without conducting any investigation into Plaintiff's retaliation claims demonstrated the Board's deliberate indifference to his rights.

"To survive summary judgment, the plaintiff must go beyond [his] pleadings and show that [he] has evidence of specific facts that demonstrate[] that the defendants exhibited deliberate indifference or reckless disregard." *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993). The evidence Plaintiff relies on does not support his assertion that the Board exercised its authority to discharge Plaintiff with deliberate indifference to his constitutional rights. The record indicates that Plaintiff did not himself inform the Board, either at the pretermination hearing or in writing, that he believed the recommendation

was retaliatory. There is no evidence in the record that the Board was otherwise informed of Plaintiff's belief that his termination was in retaliation for specific protected activity but chose not to credit Plaintiff's belief or conduct any investigation into the allegations. *Cf. Ware*, 902 F.2d at 819-20. There is also no evidence Board Members themselves believed the termination recommendation was retaliatory, but decided nevertheless to adopt the recommendation. *Cf. id.* Because there was no evidence supporting Plaintiff's claim that the Board acted with deliberate indifference to his constitutional rights, the district court properly granted summary judgment to the Board on Plaintiff's § 1983 claim.[19]

### D. Title VII Claim

Plaintiff next contends the district court erred in ruling for the Board on Plaintiff's Title VII claim. In his Title VII claim, Plaintiff asserted Defendants terminated him in retaliation for filing a discrimination complaint with the EEOC.

The ultimate question to be decided by the fact finder in a Title VII case is "'which party's explanation of the employer's motivation it believes.'" *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 386 (10th Cir. 1984) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). The plaintiff always has the burden of persuading the trier of fact that the defendant

---

[19]Based on our resolution of this claim, we need not address Plaintiff's additional claim that the individual Board Members were not entitled to qualified immunity.

-34-

intentionally discriminated against the plaintiff. *See id.* at 385. On appeal, when the Title VII case has been fully tried, this court reviews only the district court's ultimate finding of no retaliation for clear error. *See Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1266 (10th Cir. 1988). The court's finding is "clearly erroneous only if it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." *Sorensen v. City of Aurora*, 984 F.2d 349, 351 (10th Cir. 1993) (internal quotations omitted). If "there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Id.*

Our review of the record establishes there was evidence supporting the court's determination of no retaliation. Evidence was presented at trial in support of Defendants' assertion that Plaintiff failed to competently perform his job responsibilities. The evidence also established that Plaintiff received a number of reprimands and was placed on a PFI prior to his filing of the EEOC complaint. A reasonable inference from this evidence is that, as Defendants assert, Plaintiff's termination was based on continuing job performance problems and not on his filing of a complaint with the EEOC. Board Members also testified that Plaintiff's filing of the EEOC complaint was not a factor in their decision to vote in favor of his termination. Because our review of the record does not leave us

-35-

with a definite and firm conviction that a mistake has been committed, we affirm the district court's ruling on Plaintiff's Title VII claim.

## E. Evidentiary Rulings

### 1. Limitation of Testimony by Belinda Biscoe

Plaintiff challenges the district court's refusal to permit Belinda Biscoe to "testify regarding retaliatory and harassing conduct by [D]efendants similar to that experienced by [Plaintiff]." In excluding this testimony, the district court concluded that there was insufficient similarity between Plaintiff's and Biscoe's situations to justify the testimony, that the testimony was irrelevant and would be confusing to the jury, and that admission of the evidence would require the court to conduct a separate trial of Biscoe's claims.[20]

This court reviews the district court's exclusion of evidence under an abuse of discretion standard. *See United States v. Davis*, 40 F.3d 1069, 1076 (10th Cir. 1994). "[A] trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."

---

[20]The district court did allow Biscoe to testify concerning the *Dowell* case and Plaintiff's damages. The court further indicated she could briefly testify about Plaintiff's testimony on her behalf in a hearing before the Board on her charges against Steller of salary discrimination and harassment.

*McEwen v. City of Norman, Okla.*, 926 F.2d 1539, 1553 (10th Cir.1991) (internal quotations omitted).

Testimony of other employees may be relevant in assessing an employer's retaliatory intent if the testimony establishes a pattern of retaliatory behavior or tends to discredit the employer's assertion of legitimate motives. *See, e.g., Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990); *Morris v. Washington Metro. Area Transit Auth.*, 702 F.2d 1037, 1045-47 (D.C. Cir. 1983). For such testimony to be relevant, however, the plaintiff must show the circumstances involving the other employees are such that their statements can "'logically or reasonably be tied to the decision to terminate [the plaintiff].'" *Spulak*, 897 F.2d at 1156 (alteration in original) (quoting *Schrand v. Federal Pac. Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988)). Moreover, even if relevant, such evidence may be excluded under Federal Rule of Evidence 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or undue delay.

Before the district court, Defendants described a number of dissimilarities between Plaintiff's and Biscoe's situations. Biscoe and Plaintiff did not work in the same department and had different job responsibilities. Biscoe was not involved with the Equity Committee, which the district court indicated Plaintiff had placed at the center of his case. With the exception of about six weeks,

-37-

Biscoe had a different supervisor who was not involved in this case or named as a defendant by Plaintiff. Although Biscoe, like Plaintiff, was placed under a PFI and was allegedly given "impossible" job assignments, her evaluations, plans for improvement, and alleged disciplinary problems were handled by different supervisors. Finally, unlike Plaintiff, Biscoe was not discharged but was offered a contract of employment. Given these differences in Plaintiff's and Biscoe's situations, this court cannot say the district court abused its discretion in excluding the Biscoe testimony on the basis of relevance or under Rule 403.

**2. Exclusion of Testimony by John Cathey**

Plaintiff also contends the district court improperly excluded testimony of John Cathey, a former School District employee. Cathey allegedly would have testified that as head of the District's gifted program he observed that black schools were not receiving the same resources as white schools and that when he brought this to his supervisor's attention, he was told not to give this information to Plaintiff "because of the *Dowell* case." Plaintiff argues this testimony supported his § 1985 conspiracy claim. The district court excluded the testimony on the basis of relevance, confusion of the issues, and prejudice.

Cathey's supervisor was not a named defendant in this case and Plaintiff did not establish that the proffered testimony directly related to any of the Defendants in this case. Further, in the proffer, Plaintiff did not indicate the basis

for Cathey's observation or when the observation was made. The proffered testimony concerning equity in the gifted program also involved issues that went beyond those raised by Plaintiff. The district court's balancing, under Rule 403, of the probative value of this evidence against the danger of confusion of the issues and unfair prejudice was not an abuse of discretion.[21]

### 3. Limitation of Expert Witness Testimony

Plaintiff next asserts the district court improperly limited the expert testimony of Dr. Frank Morris. Plaintiff sought to offer Morris' conclusions that the recruitment plan Sylvia Little directed Plaintiff to execute was unreasonable and retaliatory. After hearing Morris summarize his proposed testimony, the district court stated Morris could testify about what constitutes effective recruiting in the particular context of historically black colleges and universities

---

[21]Plaintiff also challenges the district court's exclusion of Cathey's testimony that his supervisor, a member of Superintendent Steller's cabinet, told him to stay away from Plaintiff because he was not a "team player." Although the basis for the court's exclusion of the evidence is unclear from the record, Plaintiff asserts the district court determined the statement was hearsay, and argues this was error under Federal Rule of Evidence 801(d)(2)(D). This rule provides that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). A review of the record indicates Plaintiff did not assert before the district court that the statement was admissible based on this rule. Furthermore, Plaintiff did not satisfy his burden, as proponent of the evidence, of demonstrating to the court that the statement satisfied the requirements of the rule. *See Boren v. Sable*, 887 F.2d 1032, 1037-38 (10th Cir. 1989). We therefore reject Plaintiff's claim that this evidence was improperly excluded.

and about the difficulty and potentially negative effects of recruiting at these institutions during the summer months. The court refused to allow Morris to state his conclusions whether the recruiting plan in this case was effective and whether the plan constituted harassment or retaliation.

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides that if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." "Expert testimony is appropriate when it relates to issues that are beyond the ken of people of ordinary intelligence." *United States v. French*, 12 F.3d 114, 116 (8th Cir. 1993). The admissibility of expert testimony is within the broad discretion of the trial court and is reviewed for abuse of discretion only. *See Taylor v. Cooper Tire & Rubber Co.*, 130 F.3d 1395, 1397 (10th Cir. 1997).

In this case, the district court allowed expert testimony concerning those issues in which specialized knowledge would be helpful to the jury in understanding and evaluating evidence presented at trial. In limiting further testimony by Morris, the court noted the jury was capable of evaluating the testimony presented at trial and could determine for itself whether the recruitment plan in this case was ineffective and whether it was evidence of retaliation. The

decision to limit expert testimony in these areas which were readily within the comprehension and ability of the jury was not an abuse of the court's discretion.

### 4. Exclusion of Testimony by Jim Lazalier

Plaintiff finally asserts the district court erred in excluding the testimony of Jim Lazalier, Plaintiff's supervisor at Rose State College where Plaintiff was formerly employed. The testimony was proffered to rebut Defendants' charges that Plaintiff was incompetent and willfully neglected his duties. Plaintiff informed the court that Lazalier would testify as to whether Plaintiff was a "team player" and whether Plaintiff had willfully neglected his duties while supervised by Lazalier. The district court excluded the testimony as irrelevant. This was not an abuse of the court's discretion. Lazalier had no personal knowledge of the specific facts or issues involved in this case and therefore could not testify whether Plaintiff was competent in or willfully neglected his current duties.

## F. Jury Instruction on Due Process

Plaintiff next argues the district court's instruction to the jury concerning due process constitutes reversible error. The due process instruction stated:

> The due process clause requires that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This issue is not before you because the court has determined that plaintiff was given all the process he was due.

Plaintiff asserts that because his due process claims were resolved by the district court prior to trial, this instruction was unnecessary and prejudicially suggested he had been treated fairly.

In allowing the instruction, the district court stated that "the issue of due process was interjected into the trial" and that the instruction would "clear up any confusion" or improper inferences thereby created. The court also rejected Plaintiff's "compromise" request that the instruction only inform the jury that due process issues were not before them, without further stating the court had determined Plaintiff "was given all the process he was due."

"We review a district court's decision on jury instructions, i.e., whether to give a particular instruction, for abuse of discretion. As for the instructions themselves, we conduct a de novo review to determine whether, as a whole, they correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. Reversal is warranted only where a deficient jury instruction is prejudicial." *Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1442 (10th Cir. 1997) (citations and internal quotations omitted). In determining whether a jury instruction is prejudicial, this court does not focus on whether a particular instruction was completely faultless, but instead reviews the instructions and record as a whole to determine whether the jury was misled. *See Gardetto*, 100 F.3d at 816.

The district court did not abuse its discretion in giving the due process instruction. Because evidence relating to due process issues was introduced by Plaintiff at trial, an instruction informing the jury that all due process issues had been resolved by the court was helpful to clarify which issues were before the jury and to remedy any confusion created by the evidence. The specific instruction given by the court did not misstate the law or the facts in the case. *Cf. Hopkins v. Seagate*, 30 F.3d 104, 107 (10th Cir. 1994) (holding court's comment during jury trial that plaintiff's ERISA claim had been dismissed correctly stated the status of the claim and did not prejudice plaintiff). While the instruction went further than necessary by informing the jury the court had determined Plaintiff received all the process he was due, placed in the context of the jury instructions as a whole, the instruction was not so confusing, misleading, or prejudicial as to require reversal.

**G. Jury Verdict on Breach of Contract Claim**

Plaintiff finally challenges the jury's verdict in favor of the Board on Plaintiff's breach of contract claim. Plaintiff did not move for judgment as a matter of law on this issue at the close of all the evidence nor did he move for judgment notwithstanding the verdict or for a new trial. Consequently, Plaintiff alleges plain error in challenging the jury's verdict. *See First Sec. Bank v. Taylor*, 964 F.2d 1053, 1057 (10th Cir. 1992). Plaintiff asserts that Board

-43-

members admitted they did not themselves conclude Plaintiff was incompetent or willfully neglected his duties before they voted to discharge him and concludes this overwhelmingly establishes termination without just cause.

Our review of the record shows there was substantial evidence to support the jury's verdict. There was extensive evidence presented at trial concerning Plaintiff's failure to adequately perform his job responsibilities. This evidence was consistent with the charges contained in Superintendent Steller's letter to the Board recommending Plaintiff's discharge, which recommendation the Board accepted in voting to terminate Plaintiff's employment. The testimony referred to by Plaintiff does not demonstrate the Board lacked just cause for his termination. Instead, as previously discussed, the Board members testified that because Plaintiff did not attend the hearing, they did not themselves conduct an inquiry or make an independent determination into the merits of Steller's charges. Rather, the Board relied on Steller's evaluation and supporting evidence. *See supra* Part II.B.1. This court therefore rejects Plaintiff's challenge to the jury's verdict.[22]

### III. CONCLUSION

The district court did not err in granting Defendants' motions for summary judgment on Plaintiff's due process claims, § 1983 claim, and Title VII claim.

---

[22]Because this court rejects Plaintiff's contention that the jury verdict on the breach of contract claim must be reversed, this court need not consider his further argument that the court erred in limiting damages on this claim.

The district court also did not err in making evidentiary rulings at trial, nor did the jury instruction on due process constitute reversible error. In addition, the jury's verdict in favor of Defendants on the breach of contract claim does not constitute plain error. The district court did, however, improperly conclude that Plaintiff's pre-charge advocacy to the Board and Equity Committee concerning the need to focus on the *Dowell* schools in examining equity in the school district was not protected by the First Amendment. The matter is therefore **remanded** to the district court for further proceedings consistent with this opinion.