**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 26 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SUNIL BABBAR,

      Plaintiff - Appellant,

v.

YAR M. EBADI; BRUCE J. PRINCE;
STANLEY W. ELSEA; JAMES R.
COFFMAN; JON WEFALD;
KANSAS STATE UNIVERSITY,

      Defendants - Appellees.

No. 99-3040
(D.C. No. CV-97-2677-JWL)
(District of Kansas)

**ORDER AND JUDGMENT**[*]

Before **BRORBY**, **PORFILIO** and **LUCERO**, Circuit Judges.

This appeal arises out of an allegedly unlawful decision by defendant

officials of Kansas State University ("KSU") to deny tenure to plaintiff-appellant

Sunil Babbar. The district court granted summary judgment to defendants on all

claims. We must determine whether Babbar has presented genuine issues of

material fact with respect to his discrimination, substantive due process, and

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Kansas state law claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

From 1990 until the termination of his employment in May 1997, Babbar—a male of Indian national origin and Hindu faith—was employed as assistant professor in the Department of Management ("the Department") at KSU's College of Business Administration ("the College"). His appointment was recommended by defendant Yar M. Ebadi, then Department head and subsequently Dean of the College. The other defendants are Bruce J. Prince, current head of the Department, Stanley W. Elsea, a tenured member of the Department and Associate Dean of the College, James R. Coffman, the KSU provost, and Jon Wefald, the president of KSU.

During his employment with KSU before he was reviewed for tenure, Babbar claims to have been the object of three instances of discriminatory treatment by Ebadi. First, Babbar alleges Ebadi "hired [him] . . . as a last resort and only after the Caucasian candidates had either taken alternative jobs or rejected . . . Ebadi's offers of employment." (Appellant's Br. at 4.) Then, after Babbar accepted the offer of employment, Ebadi "reneged" on promises to furnish him with summer research and support funds and moving expenses. (I Appellant's App. at 123.) Finally, in 1992, Ebadi wrote Babbar a letter of

reprimand.  After receiving Babbar's response to the letter and despite assuring Babbar the letter would not be placed in his personnel file, Ebadi nevertheless placed it in his file.

By the time his application for tenure was considered in 1994, Babbar states, he had received consistently excellent reviews of his job performance with regard to his research and teaching—reviews often superior to those of his colleagues who were granted tenure—and no reports of deficient performance. According to Babbar, his research and teaching performance generally compared favorably with other successful applicants for tenure at the College.

The Department voted to deny him tenure, first by a vote of six to one when he applied for early tenure in the fifth year of his employment (1994-95), after which he withdrew his tenure application, and second by a vote of four to one with two abstentions when he applied for tenure the subsequent academic year (Fall 1995).  After the second Departmental vote, Prince, as Department head, forwarded a detailed memorandum to Ebadi, by that time Dean of the College, recommending that Babbar's tenure application be denied.

In the memorandum, Prince discussed the review process, which involved both review by four "external referees," (Appellees' Supp. App. at 210), and two meetings by the tenured faculty members in the Department, who were able to consider the reviews of the external referees, (see id.).  The discussion at the

Department meetings "focused on teaching, research, and collegiality," each category entailing the examination of several factors. (Id. at 210-11.) With regard to teaching, the memo reports that the comments of members of the Department "were generally positive." (Id. at 212.) Though there were certain negative comments, Prince stated that "it is my sense that many of the negative comments on [Babbar's] teaching are probably issues that have 'spilled over' from other aspects of [his] performance." (Id.)

With respect to the other two categories considered, research and collegiality, the memo's conclusions were decidedly less positive. The criteria for evaluating Babbar's "research effectiveness" used by the Department were fourfold:

> (1) success in publishing top ranked journals in the candidate's field, (2) making a clear contribution of new knowledge to his or her discipline, (3) methodological sophistication as indicated by research that uses a valid quantitative or qualitative data analytic techniques [sic], and (4) sufficient quantity of publication, but also high quality.

(Id. at 211.) In addition, the four external referees had been asked to answer the following seven questions for purposes of evaluating Babbar's research:

> (1) Does the applicant have a solid mastery of important areas of his field . . . ? (2) Beyond the content areas of research, does the applicant's work demonstrate the skills required to reliably generate new knowledge? (3) Has the applicant's research generated new knowledge . . . ? (4) Does the applicant's research have adequate breadth and depth . . . ? (5) How well has the applicant done in communicating to an adequate range of audiences . . . ? (6) Does the applicant's writing display clear and persuasive logic?

-4-

(7) In general, how does this applicant compare to others in his area who are at the same rank?

(Id.)

The memo concluded that, "[w]hile on the surface, Dr. Babbar's research performance has a number of positive aspects, a closer examination identifies a number of areas of weakness," and that "these concerns were the most significant factor in the overall negative response" to his tenure application. (Id. at 212-13.) In particular, the memo stated that Babbar had neither exhibited a "solid mastery of an important area of research" nor "made a real contribution (i.e., new knowledge) in that area." (Id. at 213.) It found "[h]e has not been successful in publishing in better quality academic journals (or getting research funding)," but rather geared his writing "generally . . . for non-academics." (Id.) In addition, the memo concluded Babbar's research demonstrated a "lack of methodological sophistication" which "does not present a methodology that meets even minimal standards of reliability and validity, appropriately control [sic] of extraneous variance, or addresses other standard methodological issues." (Id.)

As for "collegiality," the criteria used by the Department to evaluate this category included:

> (1) interpersonal honesty and integrity, (2) the effective management of conflict and disagreement that are an inevitable part of organizational life, (3) trust in the continuing appropriate behavior after tenure is granted, and (4) behavior that helps other colleagues successfully contribute to the mission.

(Id. at 211.)  In this area, Prince's memo cited tenured colleagues' criticisms of Babbar describing him as "two-faced," "will say one thing and do another," and "will say different things to different people," as well as characterizing him as having "zero collegiality" and a "superiority complex."  (Id. at 213.)  To illustrate "the way that Dr. Babbar has gotten himself into trouble on collegial [sic] grounds," the memo cited an incident in which Babbar had, entirely unsolicited, prepared and distributed to all Department heads a summary of "the productivity of the faculty in the College."  (Id. at 214.)  In that summary, Babbar totaled the publications of all faculty members, but did not distinguish between "[t]op-tier journal articles and books" on the one hand and "regular conference proceedings" and "paper abstracts" on the other.  (Id.)  The effect of the document was "to unnecessarily irritate people" and cause colleagues to perceive Babbar as "engag[ing] in tactless and inaccurate self-promotion" and to distrust his teaching and research record.  (Id.)

The memo concluded, based on the foregoing analysis, that

> The profile of performance that Dr. Babbar's case presents does not lack controversy . . . .  Tenure is an extremely long term investment.  It is one that has an irrevocable and strong impact on the future evolution of a department.  Given the magnitude of investment that tenure implies and the substantial negative indicators I see, I cannot support this case without hesitation.  Therefore, I must concur with the majority of my departmental tenure colleagues and cast a negative vote for Dr. Babbar's promotion and tenure.

(Id. at 215.)

-6-

The College's Committee on Promotion and Tenure thereupon reviewed Babbar's application for tenure and concluded as follows:

> The vote was negative. His research was described as methodologically weak and lacking in overall quality. He was described as a good teacher but poor colleague within his department. He was characterized as being unable to mentor junior faculty. Two members of the committee described him as engaging in unethical behavior on various occasions. They stated they had first-hand knowledge of these incidents.

(Id. at 216.) In December 1995, Ebadi informed Babbar that "based on the recommendations of your departmental faculty, department head, and the College Committee on Promotion and Tenure, I have decided not to recommend you for promotion and tenure," citing the "inadequacy" of his research program as "[t]he primary reason for this decision." (Id. at 233.)

An appeal of the denial of his tenure application to Provost Coffman resulted in an affirmance of that decision. Coffman stated in a letter informing Babbar of his affirmance of the decision that,

> in reviewing [additional material compiled in support of the appeal as well as the original material submitted], it becomes clear that this matter is fundamentally based upon your apparent assumption that if a certain number of quantifiable criteria are met, then tenure (and promotioin) has been earned and its conferral is automatic. This is not the case. Tenure especially is granted when and if the university has [determined] that it is in the best interest of the institution and the performance of the individual has been deemed sufficient to warrant it.
> . . . .
>
> The process followed did not violate university policy or procedure. I do not believe discrimination to be involved, having reviewed the ethnic and gender mix of the department and college. I do not believe that all of the

faculty and administrators who reviewed your application and made a collective recommendation did not consider the material, or in someway [sic] conspired to do you ill. Thus, there is no reason to believe that this decision was arbitrary or capricious.

(I Appellant's App. at 111.)

In a final step before commencing litigation in federal court, Babbar filed a grievance with KSU's General Faculty Grievance Board, challenging the denial of tenure, pursuant to which two hearings were conducted, in December 1996 and January 1997. A faculty spokesman represented Babbar at the hearings, and an attorney was present to advise him. The tenured faculty members who had voted against him or abstained in the Department tenure proceeding testified in the grievance proceedings. Elsea testified that, although Babbar's lack of collegiality was of concern to him, he voted against granting tenure on the basis of Babbar's research. The others furnished similar testimony.[1]

After conducting the hearings, the grievance panel issued a written report and recommendation to Wefald, KSU's president. In that report, the panel found the Department "failed to follow established procedure in evaluating Dr. Babbar's research" in the following ways: (1) by "arbitrarily reject[ing] the opinions of outside reviewers"; (2) by the failure of several voting members of the Department to read Babbar's articles before discounting the opinions of external

---

[1] The only witness for whom there is inadequate record evidence of grievance hearing testimony in this regard is David Andrus.

reviewers and negatively evaluating his research; (3) by capriciously reasoning that articles appearing in "high-ranking" journals were published early in Babbar's career and therefore did not meet the Department's research criteria; (4) by arbitrarily adding an empirical research requirement late in Babbar's tenure track progression; and (5) by failing to provide Babbar with a written record of unsatisfactory research performance, instead consistently rating his research as "exceeding expectations." (Appellee's Supp. App. at 203-04.)

With regard to collegiality, the panel found the Department "improperly applied collegiality as a criterion for Tenure and Promotion" because that criterion had not been previously employed in evaluating tenure applications and because Babbar had not been sufficiently alerted to problems with collegiality in the previous evaluations he received. The report recognized, however, that "[t]here is . . . no doubt that a collegial relationship between Dr. Babbar and his colleagues and administrators does not exist at this time, and . . . that Dr. Babbar is, to a degree, responsible for creating this relationship." (Id.)

As a result of those findings, the panel issued the following recommendation:

> The panel judges [find] that there was misapplication of written rules and improper action on the part of the University. Nonetheless, it is the Grievance Panel's judgment that professional relationships between Dr. Babbar and his departmental colleagues have been permanently and irreparably broken. The panel also finds that Dr. Babbar's continued long-

term employment in the Department . . . is not in the best interest of the University, the College . . . , the Department . . . , or [Babbar].

In conclusion, the panel recommends that the administration and [Babbar] negotiate a settlement that includes Dr. Babbar's resignation from the University. If that is not possible, the panel has <u>no alternative</u> but to recommend that he be granted Tenure and Promotion.

(<u>Id.</u>)

On reviewing the Grievance Panel's report, KSU President Wefald issued a confidential memorandum to the chairperson of the Grievance Board, Coffman, the president of KSU's Faculty Senate, and Babbar. The memo definitively denies Babbar tenure, citing the Faculty Handbook for the proposition that "tenure is not a right accorded to every faculty member . . . 'with a record free of notable deficiencies'" and determining that "tenure is peer-review process," and the result of that peer review did not leave Wefald "without a reasonable doubt" of Babbar's qualifications for tenure, as required by the Faculty Handbook. (<u>Id.</u> at 208-09.) The memo further determined that "[Babbar's] resignation is not necessary since he is on a terminal contract." (<u>Id.</u> at 209.)

Babbar thereupon filed suit in United States District Court for the District of Kansas against KSU, Ebadi, Elsea, Coffman, and Wefald, alleging reverse sex, national origin, and religious discrimination claims, violation of his substantive due process rights, conspiracy, and state tortious interference claims, as well as

request for injunctive relief (award of tenure).  The district court granted summary judgment to defendants on all claims.

## II

We review Babbar's appeal of the grant of summary judgment de novo, applying the same standard as the district court.  See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998).  Under this standard, we examine the record to determine whether any genuine issue of material fact is in dispute. See id.  We construe the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party.  See Curtis v. Oklahoma City Pub. Schs. Bd. of Educ., 147 F.3d 1200, 1214 (10th Cir. 1998).  When the nonmovant bears the burden of proof at trial, that party can prevail in a motion for summary judgment only by going beyond the pleadings and presenting evidence sufficient to establish the existence of a triable issue as to an essential and contested element of that party's case.  See McKnight, 149 F.3d at 1128.

## III

We turn first to Babbar's claims of reverse discrimination based on gender and claims of discrimination based on religion and national origin under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.

## A

With regard to Babbar's reverse sex discrimination claim, under the framework set forth by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Babbar bears the initial burden of establishing a prima facie case, which if shown, raises a rebuttable presumption of unlawful discrimination. See Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999), cert. denied, No. 99-1527, 2000 WL 287741 (U.S. May 15, 2000). There is "a logical connection between each element of the prima facie case and the inference of discrimination." Id. at 1136 (citation omitted).

To establish a prima facie case of gender discrimination under Title VII, a plaintiff must typically show that: (1) the plaintiff belongs to a protected class; (2) the plaintiff was qualified for the job; (3) despite being qualified, the plaintiff was discharged; and (4) the job was not eliminated after the discharge. See id. at 1135. For a reverse discrimination claim like Babbar's, however, the first prong of the prima facie case is modified to require a showing of background circumstances that support an inference that KSU is one of those unusual employers who discriminates against the majority or a historically or socially favored group. See Notari v. Denver Water Dep't, 971 F.2d 585, 588-89 (10th Cir. 1992). Alternatively, Babbar can demonstrate a prima facie case of reverse discrimination either by presenting "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable

-12-

probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." Id. at 590. A different standard is applied to reverse sex discrimination claims because there is no reason to presume discrimination against historically favored litigants in the event of adverse employment actions. See Livingston v. Roadway Express, Inc., 802 F.2d 1250, 1253 (10th Cir. 1986).

In support of his claim, Babbar argues that three less qualified female professors were given tenure while he was passed over. Such evidence is insufficient in reverse discrimination cases because the presumption of discrimination is not afforded to the majority group under the McDonnell Douglas framework. As the district court correctly notes, "[t]he only evidence plaintiff offers in support of his sex discrimination claim is his belief that he was better qualified for tenure than [three tenured women; this] evidence does not suggest that defendant discriminates against men." Babbar v. Ebadi, No. 97-2677-JWL, at 30-31 (D. Kan. Dec. 31, 1998). Furthermore, as the district court notes, the record belies any overall favoritism towards women, as another male was given tenure in the Department at the same time Babbar was refused it, and in his Department, five of seven tenured members are male—including the Department head. See id. at 31. Of the three women he points to with tenure, two in his Department were granted tenure several years before him, and the third, although

-13-

granted tenure at the time Babbar's tenure application was denied—was granted tenure in the Accounting Department.    Babbar has failed to show a genuine issue of material fact as to background circumstances tending to show that KSU is one of those unusual employers that discriminates against the male majority, nor is there a genuine issue of material fact that but for his gender he would have been granted tenure.    See Notari , 971 F.2d at 588-89. [2]   The district court committed no error in granting defendants' motion for summary judgment here.

### B

As regards the district court's grant of summary judgment on his national origin and religious discrimination claims, KSU does not contest that Babbar has established a prima facie case.    Thus, the only issue on appeal is whether Babbar

---

[2] The district court also noted that even if plaintiff had established a prima facie case, "the record is devoid . . . of any evidence that defendant's proffered reasons for denying plaintiff's tenure application are pretextual." Babbar, No. 97-2677-JWL, at 31 n.10.  While he presents evidence asserting that his qualifications for tenure, such as his research, were unfairly judged, Babbar does not present any evidence that they were dishonestly judged.  His own opinions about his qualifications do not give rise to a material factual dispute.  See Bullington v. United Airlines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999).  Even if we were to assume that KSU officials misjudged Babbar's qualifications, such evidence would not preclude summary judgment.  See id.  The relevant inquiry is not whether KSU's "proffered reasons were wise, fair or correct, but whether [KSU] honestly believed those reasons and acted in good faith upon those beliefs."  Id. (citing Sanchez v. Philip Morris Inc., 992 F.2d 244, 247 (10th Cir. 1993) ("Title VII is not violated by the exercise of erroneous or even illogical business judgment.")) (further citations omitted).

-14-

has established sufficient evidence of pretext. Once a plaintiff establishes a prima facie case, the "defendant must then articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff." Perry, 199 F.3d at 1135 (citing McDonnell Douglas, 411 U.S. at 802). If the defendant is able to articulate a valid reason, the plaintiff can avoid summary judgment by showing that a genuine dispute of material fact exists as to whether this reason was pretextual. See Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).

In support of his pretext claim, Babbar argues KSU's requirement for empirical research was revealed to him at too late a stage in his pre-tenure career to enable him to fulfill that requirement and that KSU's subjective view of his lack of collegiality was inappropriate. However, he has presented no evidence that the denial of tenure was due to his national origin or religion. Rather, the record in this case is replete with evidence that KSU denied Babbar tenure based on his inability to get along with a number of his colleagues and perceived deficiencies in his research. His own conclusory opinions about his qualifications and Ebadi's anti-Hindu, anti-Indian animus do not give rise to a material factual dispute. See Bullington v. United Airlines, 186 F.3d 1301, 1318 (10th Cir. 1999). Even assuming arguendo that KSU misjudged Babbar's qualifications or used questionable criteria in evaluating his tenure application, such evidence would not

preclude summary judgment under circumstances in which no cognizable evidence of pretextuality was presented. See id; see also Randle, 69 F.3d at 454 ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." (citation omitted)); Ingels v. Thiokol Corp., 42 F.3d 616, 623 (10th Cir. 1994) (holding that deviations from established procedure "go[] only to process and not to purpose or motivation"). The relevant inquiry in a Title VII discrimination action is not whether KSU's "proffered reasons were wise, fair or correct," but whether KSU "honestly believed those reasons and acted in good faith on that belief." Bullington, 186 F.3d at 1318 (citing Sanchez v. Phillip Morris, Inc., 992 F.2d 244, 247 (10th Cir. 1993)). Federal courts are not particularly well-suited to the task of evaluating the criteria for successful tenured professors and are particularly ill-suited to determine the best candidates. See id. at 1318 n.14. "We previously have recognized that . . . when analyzing the pretext issue, [we] do not sit as 'super-personnel departments' free to second-guess the business judgment of an employer." Id. (quoting Simms v. Oklahoma, 165 F.3d 1321, 1330 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999)). Viewing the evidence in the light most favorable to Babbar indicates, at most, that KSU's decision not to grant tenure may have been unwise and even flawed (as the

-16-

Grievance Panel itself indicated), but no genuine issue of material fact as to pretext has been shown.

Nonetheless, the district court thoroughly analyzed the evidence supporting each of Babbar's allegations that he was treated differently and not granted tenure compared to less qualified candidates. See Babbar, No. 97-2677-JWL, at 21-30. The district court evaluated each individual to determine if that individual was similarly situated, and if so, whether the individual was held to a different standard or was significantly less qualified. See id. Applying our Circuit's precedent in light of the evidence before it, the district court found no support for a finding of pretext. Based on our comprehensive examination of the record before us, we take the district court's view of the matter. [3]

---

[3] Despite superficial similarities between Bennun v. Rutgers State University, 941 F.2d 154 (3d Cir. 1991), that case is distinguishable from the case at bar. To begin with, because Bennun's case was tried by the district court, the finding of discrimination in that case was based on the district court's credibility determinations and upheld on appeal under the clear error standard of review. See id. at 178. Furthermore, unlike in the Bennun case, there was an amply sufficient record of collegiality problems between Babbar and his colleagues—on its face entirely unrelated to his religion and national origin—to draw the conclusion that there was no genuine issue of material fact as to whether the denial of tenure was pretextual. Another important difference between Bennun and the present case is that the candidate in Bennun was consistently supported for promotion by individuals in his department most familiar with his research, see id. at 161-62, whereas in the present case, Babbar's Department—and those in charge of reviewing his application—twice denied him tenure. Here, we would be seriously interfering with KSU's tenure decision process and acting as a "super-personnel department[]" contrary to the strictures of Bullington, 186 F.3d at 1318 n.14 (internal quotation omitted). To the extent Bennun can be otherwise

In addition to Babbar's comparisons with other candidates, he argues that the College has never tenured any Indians or Hindus and has mistreated the only other Indian employee besides himself. However, as both the district court and KSU in its brief note, Babbar's statistics are fatally incomplete because they fail to show the number of individuals of Indian national origin or Hindu faith, if any, who were denied tenure by the Department. We have no evidence before us as to the number of Indians, Hindus, or members of ethnic and religious minorities in general that have applied for tenure, let alone for other untenured positions, with KSU. See Doan v. Seagate Tech., Inc., 82 F.3d 974, 979 (10th Cir. 1996) ("While statistical evidence may create an inference of discrimination, the evidence may be so flawed as to render it insufficient to raise a jury question."). As to the alleged mistreatment of another Indian employee, evidence that another employee believes KSU discriminated against him is insufficient to preclude summary judgment because that evidence constitutes merely a subjective belief of discrimination. See Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1491 (10th Cir. 1995). [4] On the basis of the evidence before us, there are gaps in appellant's

interpreted, it is contrary to the law of our Circuit.

[4] With regard to the "collegiality" criterion used by the Department in reviewing his application for tenure, Babbar argues that our Circuit's precedent regards employers' use of such "subjective" factors as "powerful indicia of pretext." (Appellant's Br. at 18.) However, Babbar misinterprets our precedent in this regard. For example, in support of his pretext argument, he cites Mohammed v. Callaway, 698 F.2d 395, 401 (10th Cir. 1983). That case, however,

case, and we simply find no genuine issue of material fact in this case as to whether Babbar suffered discrimination due to his religion or national origin. Summary judgment was appropriate as to these claims.

**IV**

With regard to Babbar's claim against Ebadi under Kansas state law for tortious interference with prospective business advantage, Babbar alleges Ebadi deliberately put an inaccurate and discriminatory criticism into his personnel file. To prevail on that claim, Babbar must show: "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." Noller v. GMC Truck & Coach Div., 772 P.2d 272, 276 (Kan. 1989) (quoting Turner v. Halliburton Co., 722 P.2d 1106, 1115 (Kan. 1986)) (further citations omitted).

emphasizes that "[t]he use of such subjective criteria . . . 'may offer a convenient pretext for giving force and effect to racial prejudice' and 'can create a strong inference of discrimination if there is a showing of significant disparity in the representation of a particular group.'" Id. (quoting Thornton v. Coffey, 618 F.2d 686, 691 (10th Cir. 1980); Bauer v. Bailar, 647 F.2d 1037, 1045 (10th Cir. 1981)) (further citations omitted) (emphasis added). In the present case, as noted, there was no adequate showing of such significant disparity of representation.

The dispute here is over the whether the district court erred in finding that Babbar did not demonstrate a reasonable expectancy of tenure under the third prong of Noller .[5] Based on his positive reviews until the denial of tenure, Babbar argues that he had every reason to expect tenure would be granted. The district court nevertheless granted summary judgment to Ebadi based on a variety of provisions in Babbar's contract and the Faculty Handbook. Specifically, his 1995-96 contract states his appointment to a "probationary status" was for a period of nine-months and was subject to a one-year notice of non-reappointment, which he received in the form of a final, terminal contract for the 1996-97 academic year, by its terms to expire automatically on June 10, 1997. (I Appellant's App. at 73, 112-13.)    The Faculty Handbook states that a probationary faculty member does not have what can be considered a claim to his or her position: Tenure is neither a "guarantee" nor a "right;" "[t]here can be no simple list of accomplishments that, when achieved, guarantee that a faculty member will obtain tenure;" and "[t]enure is not a right accorded to every faculty member[, n]or is it granted simply as a result of a candidate's routinely meeting assigned duties with a record free of notable deficiencies."    (II Appellant's App. at 567.)

Our review of the foregoing provisions and the record of overwhelming opposition to granting tenure to Babbar indicates that even without the letter of

---

[5] Babbar abandoned the tortious interference with contract claim on appeal.

reprimand in his file, Babbar was unlikely to have been granted tenure and had no reasonable expectation of tenure on the facts of this case. Ebadi's conduct thus does not run afoul of the third prong of the Kansas test for tortious interference with prospective business advantage, and the district court correctly granted summary judgment as to this issue. [6]

## V

As for Babbar's conspiracy claim, "the essential elements of a [42 U.S.C.] § 1985 claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993).

The district court held Babbar failed to meet the first and second elements of a § 1985(3) conspiracy claim, i.e., he failed to establish agreement and concerted action as well as the existence of a discriminatory motive to deprive him of equal protection or equal privileges and immunities. As to the conspiracy claim, to survive a motion for summary judgment Babbar must furnish a genuine factual basis to support the existence of the defining elements of a

---

[6] Contrary to Babbar's contention, the fact that he was not an at-will employee is irrelevant to establishing a reasonable expectation of tenure on the facts before us: His employment contract was for a finite period, and the tenure decision, as noted, is highly discretionary.

conspiracy—agreement and concerted action. See Crabtree v. Muchmore, 904 F.2d 1475, 1476 (10th Cir. 1990). In that regard, he suggests that he has proffered indirect evidence showing a meeting of the minds to deny him tenure by showing members of the tenure committee accepted Ebadi's letter without question and upper-level members of the KSU administration "rubber-stamped" the committee's recommendation. (Appellant's Br. at 26.) But as the district court points out, Babbar has thereby established only that each defendant arrived at the same negative conclusion on the question of tenure. See Babbar, No. 97-2677-JWL, at 20. That bare coincidence is insufficient to demonstrate a genuine issue of material fact as to the existence of an agreement between defendants or a meeting of their minds. See Muchmore, 904 F.2d at 1476.

With respect to the discriminatory motive, a plaintiff must establish that a class-based or racially discriminatory motive lurks behind the conspiratorial activities. See Tilton, 6 F.3d at 686 ("[Section] 1985(3) does not 'apply to all tortious, conspiratorial interferences with the rights of others,' but rather, only to conspiracies motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" (quoting Griffin, 403 U.S. at 101-02)). To survive summary judgment, Babbar argues he needed to show only that he was treated differently than a similarly-situated individual, but needed demonstrate no specific form of discrimination, relying on Jacobs, Visconsi & Jacobs, Co. v. City

of Lawrence , 927 F.2d 1111 (10th Cir. 1991), in support of that proposition.

Jacobs , however, was an action under 42 U.S.C. § 1983, not a § 1985 conspiracy case. To survive a motion for summary judgment in a § 1985 conspiracy case, we have stated unequivocally that a plaintiff must establish a genuine issue of material fact as to class-based or racially discriminatory motives underlying conspiratorial activities. See Tilton , 6 F.3d at 686 . As discussed in the context of his Title VII reverse discrimination claims, Babbar has not provided evidence of race- or class-based discriminatory motives sufficient to withstand defendants' summary judgment motion. Because he has not alleged any facts showing defendants agreed to single him out for disparate treatment or establishing race- or class-based animus as required by § 1985, see Kush v. Rutledge , 460 U.S. 719, 725-26 (1983), the judgment of the district court must be affirmed as to this claim.

## VI

Finally, with regard to the violation of Babbar's substantive due process rights, "the Fourteenth Amendment protects citizens from the deprivation of 'life, liberty, or property, without due process of law. . . .' U.S. Const. amend. XIV, § 1." Hennigh v. City of Shawnee , 155 F.3d 1249, 1253 (10th Cir. 1998). "[S]ubstantive due process . . . guarantees that the state will not deprive a person of those rights for an arbitrary reason regardless of how fair the procedures are

-23-

that are used in making the decision." Archuleta v. Colorado Dep't of Insts., 936 F.2d 483, 490 (10th Cir. 1991) (citations omitted). Rights protected by due process are "'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" Jones v. University of Cent. Okla., 13 F.3d 361, 365 (10th Cir. 1993) (quoting Perry v. Sindermann, 408 U.S. 593, 602 n.7 (1972)).

The burden of identifying the rights allegedly violated by defendants is on Babbar, see Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 527 (10th Cir. 1998), a burden he failed to meet at the district court level. However, assuming arguendo that he is referring to the previously asserted claim that he has a right to tenure, his claim fails because, as discussed, neither his contract nor University policy as set forth in the Faculty Handbook nor any other provision of Kansas state law of which we are aware establishes a right to tenure—nor, as the district court noted, has such a right been recognized. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 578 (1972) (holding that an assistant professor with no tenure rights did not possess a property interest in continued employment where the appointment contract "secured absolutely no interest in re-employment for the next year" and no state statute or university rule secured his interest in re-employment); Weathers v. West Yuma County Sch. Dist. R-J-1, 530 F.2d 1335, 1336-38 (10th Cir. 1976) (holding that an untenured teacher employed under

contracts containing specific terms did not possess a property interest protected by the Fourteenth Amendment because he possessed no state statutory or contractual right of continued employment and failed to show any informal custom or policy of re-employment); see also Brenna v. Southern Colo. State College, 589 F.2d 475, 476 (10th Cir. 1978) ("In order to present a claim of denial of 'substantive' due process by a discharge for arbitrary and capricious reasons, a liberty or property interest must be present to which the protection of due process can attach.").

Even if Babbar had established a fundamental property interest in tenure protected by substantive due process, the denial of that interest was neither arbitrary nor lacked a rational basis. See Curtis, 147 F.3d at 1215; Brenna, 589 F.2d at 477 (10th Cir. 1978) ("'Substantive' due process requires only that termination of [a protected] interest not be arbitrary, capricious, or without a rational basis." (citations omitted)). In Uhlrig v. Harder, 64 F.3d 567 (10th Cir. 1995), we stated that "the standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.'" Id. at 573 (quoting Collins v. City of Harker Heights, 503 U.S. 115 (1992)) (further quotations omitted). To "satisfy the 'shock the conscience' standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing

government power." Id. at 574. Rather, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Id. In Regents of the University of Michigan v. Ewing, 474 U.S. 214 (1985), the Court set forth the following standard for analyzing substantive due process claims arising out of academic decisions:

> When judges are asked to review the substance of a genuinely academic decision. . ., they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

Id. at 225 (citation omitted). However unfortunate KSU's tenure decision may have been in the present case, Babbar has not presented evidence sufficient to raise a genuine issue of material fact as to whether KSU's actions were shocking to the conscience to an extent meriting the judicial override of KSU's tenure decision.

## VII

The judgment of the district court is **AFFIRMED.**

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge