Sherian **GANSERT**, Plaintiff,

v.

State of **COLORADO**, Department of **Higher Education, Colorado Student Loan Program; and Jeanne M. Adkins, in her Individual and official capacities, Defendants.**

No. CIV.A.03–F–1327(PAC).

United States District Court,
D. Colorado.

Dec. 10, 2004.

Seth J. Benezra, Benezra & Culver, LLC, Lakewood, CO, for Plaintiff.

Andrew David Ringel, Thomas J. Lyons, Hall & Evans, Denver, CO, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FIGA, District Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt.# 62) filed June 18, 2004, which contains a supporting brief and is accompanied by exhibits numbered A–1 through A–57, some of which were filed under seal. Plaintiff submitted her response in opposition to defendants' motion on August 5, 2004, accompanied by exhibits numbered 1 through 25. Defendants filed their reply brief on September 10, 2004.

## BACKGROUND

Plaintiff Sherian Gansert filed her amended complaint in this case on September 5, 2003, asserting two claims for relief arising from her termination as an employee of Defendant Colorado Student Loan Program ("CSLP"). She alleges, essentially, that Defendant Adkins, her supervisor, retaliated against her and wrongfully terminated her from her position in April 2003 because plaintiff disclosed to CSLP legal counsel what plaintiff considered to be improper financial conduct in the office of the CSLP. Plaintiff alleges that the retaliation and termination by Ms. Adkins violated her rights of free expression under the First Amendment and violated the Colorado State Employee Protection Act, C.R.S. § 24–50.5–101, *et seq.* (sometimes referred to as the "Whistleblower Act"). The amended complaint names Ms. Adkins as a defendant in both her official capacity and her individual capacity.

By Order entered on September 14, 2004, this Court granted in part and denied in part the motion to dismiss filed by Defendant Adkins, clarifying that she could not be sued for damages in her "official capacity" as an employee of the State of Colorado, nor for retroactive injunctive relief, but she could be sued in her

official capacity for prospective injunctive relief. The Order also denied Defendant Adkins' request to stay all proceedings in this case pending this Court's decision on her motion for summary judgment, which has been seeking dismissal of the claims against her based on her argument that she was protected by qualified immunity.

On September 16, 2004, Defendant Adkins filed an appeal of this Court's Order and a petition for writ of mandamus with the Tenth Circuit. On September 20, 2004, this Court denied Defendant Adkins' motion to stay proceedings in this case pending a ruling by the Tenth Circuit on those matters. On September 20, 2004, the Tenth Circuit denied Defendant Adkins' request for a writ of mandamus seeking a stay of this case until a determination on her assertion of qualified immunity. On December 3, 2004, the Tenth Circuit dismissed Defendant Adkins' appeal from the denial of a stay due to a lack of jurisdiction.

It appears that discovery was completed after this Court's rulings of September 2004, and a Final Pretrial Order was entered on September 30, 2004. On October 4, 2004 this case was set for a seven-day jury trial to commence March 28, 2005. The Court has received no supplemental exhibits or briefs in relation to the defendants' motion for summary judgment. Thus, the motion is now ripe for determination.

### UNDISPUTED FACTS

Plaintiff was employed at CSLP, a division of the Department of Higher Education of the State of Colorado, from January 1, 1980 until the time she left the agency in April 2003. The parties have agreed that the following facts regarding her employment are undisputed, at least for the purposes of this motion. (See Defendants' brief, statement of undisputed facts 1–25 and 30–51, plaintiff's responses

thereto at 3–4, and stipulations in Supplemental Final Pretrial Order).

Plaintiff began employment with CSLP in 1980. In 1981, she was promoted to the position of Assistant Director of Administration. In 1984, she became the Associate Director for Administration, a position she remained in until 2003. (Supplemental Final Pretrial Order at 13). Her employment during this period of time was governed by a series of written employment agreements, each of a duration of one year or less (Defendants' brief at 3; plaintiff's response at 3). Plaintiff also served in the position of State Controller's Delegate to CSLP (Defendants' brief at 9; plaintiff's response at 3). As part of her responsibilities as State Controller Delegate, plaintiff reviewed and approved acquisitions made by CSLP (Id.). According to Colorado law and applicable fiscal policies, the intricacies of which need not be detailed here, the State Controller is authorized to commit funds for goods and services only after a purchase order or contract is in place. Plaintiff, in her position as State Controller Delegate to CSLP, possessed the authority to recommend to the State Controller ratification of any commitment made by CSLP in violation of Colorado law (Defendants' brief at 9; plaintiff's response at 3).

From May 1985 through February 2002, Robert Fomer was the Director of CSLP, apparently serving as plaintiff's supervisor (Defendants' brief at 4; plaintiff's response, p. 3). In March 2002, Defendant Adkins was appointed as Director of CSLP and became plaintiff's supervisor (id.). In July 2002, plaintiff executed a one-year employment agreement for the period July 1, 2002 through June 30, 2003, and Defendant Adkins signed the agreement on behalf of CSLP (Defendants' Exhibit A–31).

On January 24, 2003, during a review of CSLP commitment documents, plaintiff

discovered what she believed to be two instances of committal of State funds made prior to the requisite purchase order or contract (Defendants' brief at 12; plaintiff's response at 4). Plaintiff considered these two instances to be deliberate violations of state law by the individuals involved, one of which was Defendant Adkins (Gansert Depo. at 134–35; Exhibit 1 to plaintiff's response). That same day, plaintiff contacted Mr. Charles Heim, Esq., the Associate Director of Legal Affairs for CSLP, expressed her concern over this matter and requested that he review the documentation concerning the two instances (Defendants' brief at 12; plaintiff's response at 4). Upon his initial review, Mr. Heim, concluded that the two instances appeared to violate state fiscal laws and so informed plaintiff (*id.*).

Plaintiff testified that she did not raise the matter with Defendant Adkins on January 24, 2003 because she had gone to her attorney on this matter and "through him he was going to notify Ms. Adkins of the situation, which I believe he did." (Gansert Depo. at 154). According to Mr. Heim, he served as plaintiff's attorney with respect to her State Controller delegate functions (Heim Depo. at 27, Exhibit 9 to plaintiff's response). Later on January 24, 2003, plaintiff informed Mr. Heim that based on further research she had conducted, she concluded that one of the two matters turned out not to be a problem.[1] (Defendants' brief at 13; plaintiff's response at 4).

Sometime thereafter, Mr. Heim spoke to Defendant Adkins and Mr. Robert Haddock, the other individual involved, and advised them of the potential violation of state law, as well as the fact that individuals responsible for improper commitments could be held personally liable (Defendants' brief at 13; plaintiff's response at 4). Mr. Heim advised plaintiff not to approve the remaining purchase order relating to Robert Half Technology, as to which the issue remained unresolved (Defendants' brief at 13; plaintiff's response at 4).

Subsequently in February 2003, Brian Burnett, the chief financial officer of the Colorado Department of Higher Education conducted an investigation into the matter, the details of which are not pertinent to this order. Suffice it to say that on February 24, 2003, Mr Burnett submitted a memorandum to the State Controller, requesting the State Controller to "ratify the violation of state fiscal rules and Colorado law." (Defendants' brief at 14; plaintiff's response at 4; see also Exhibit A–50 to Defendants' brief). On March 13, 2003, the Office of the State controller ratified the procurement and authorized CSLP to pay for the services to Robert Half Technology (Defendants' brief at 15, and Exhibit A–51 thereto; plaintiff's response at 4).

Eleven days later, on March 24, 2003, Defendant Adkins met with plaintiff and informed her that her annual contract of employment with CSLP would not be renewed following its expiration on June 30, 2003 (Defendants' brief at 15; plaintiff's response at 4). The Court notes that the plaintiff's employment agreement for the period July 1, 2002 through June 30, 2003 does not contain a specific provision addressing renewal or non-renewal of the agreement (*see* Exhibit A–31 to Defendants' brief). However, Section 2 of the employment agreement provides that "[t]he employee is deemed to be an employee at-will," and Section 8 of the agree-

---

1. The matter that continued to be an issue involved a commitment to pay a finder's fee of $10,000 to Robert Half Technology, apparently an executive recruiting agency, in con-

nection with the hiring by CSLP of a programmer named David Margolis (Defendants' brief at 11; plaintiff's response at 3).

ment provides that "[t]his AGREEMENT may be terminated at any time by either of the parties, hereto, upon thirty(30) days written notice one to the other." (*Id.*)

In a written memorandum to plaintiff dated April 9, 2003, referencing their March 24, 2003 conversation, Defendant Adkins wrote that:

> You were informed that although you were being given 30 days notice per terms of the contract for at-will employees, that the separation would involve leaving CSLP immediately.

> In the same conversation, you were offered the opportunity to complete an additional 60–day contract extension offsite that involves completion of two projects . . . .

(Exhibit A–53 to Defendants' brief). Plaintiff did not accept the offer to work "off-site" and apparently did not return to work at CSLP.[2]

## PLAINTIFF'S CLAIMS

Plaintiff's amended complaint, filed September 5, 2003, asserts two claims for relief. The First Claim, asserted only against Defendant Adkins under 42 U.S.C. § 1983, alleges that Defendant Adkins, acting under color of state law, retaliated against plaintiff for exercising her right to freedom of speech in violation of the protections afforded by the First Amendment. Plaintiff alleges that the retaliation took the form of treating plaintiff with hostility, unjustly criticizing and scrutinizing her work and terminating plaintiff's employment (Amended Complaint, ¶ 25). Plaintiff alleges as damages what she describes as "lost back and front-pay," lost benefits, emotional distress damages, compensatory damages and punitive damages. (Amended Complaint, ¶ 31).

The Second Claim, asserted against all defendants including the Colorado state agency defendants, alleges that plaintiff acted under the protections of the so-called Colorado "Whistleblower Act," C.R.S. § 24–50.5–101 *et seq.*, when she disclosed violations of policy and procedure regarding accounting practices at CSLP (Amended Complaint, ¶ 33). She alleges that she was terminated for disclosing such information and that her termination violated the Act. Plaintiff alleges as damages for this claim the same damages as alleged for the First Claim (Amended Complaint, ¶ 35).

In her prayer for relief plaintiff requests: (a) injunctive and declaratory relief, (b) damages for "back-pay" and for "lost benefits, wages, promotions, tenure, seniority and other employment opportunities," (c) an order of reinstatement or in the alternative front-pay and benefits, (d) compensatory damages including damages for emotional distress, and (e) punitive damages. Plaintiff requests a jury trial on all issues triable to a jury.

## DEFENDANTS' MOTION

Defendants argue that Ms. Adkins is entitled to summary judgment on plaintiff's First Claim based on her qualified immunity as a state official. Specifically, defendants state that plaintiff has not demonstrated any violation of her First Amendment rights, or at least a right that was "clearly established" so as to deprive Defendant Adkins of qualified immunity.

Defendants argue that all defendants are entitled to summary judgment on

---

**2.** Defendants' brief states that plaintiff "chose to retire" and cites to pages numbered 219 and 221 of plaintiff's deposition (Exhibit A–2 to Defendants' brief) to support this proposition. *See* Defendants' brief, p. 15. However, the Court does not find any such testimony at pages 219 or 221 of Exhibit A–2 to Defendants' brief, even taking into account the fact that the pages of Exhibit A–2 bear multiple and conflicting page numbers. The asserted testimony does not appear at either version of pages 219 or 221.

plaintiff's Second Claim under the Colorado Whistleblower statute because her actions did not satisfy the statutory requirement of making a "disclosure" of information covered by that Act, nor did she meet the statutory prerequisite contained in C.R.S. 24–50.5–103(2) of making a "good faith effort" to provide the information to a supervisor prior to making a "disclosure" of such information.

Defendants also argue that plaintiff's "economic damages ... are limited by her annual at-will contract of employment" and that she has set forth no evidentiary basis for any punitive damages claim against Defendant Adkins under either federal or Colorado law.

## STANDARD FOR SUMMARY JUDGMENT

The purpose of a summary judgment motion is to assess whether a trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). In other words, there "must be evidence on which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir.1995), *cert. denied*, 516 U.S. 1160, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court grants summary judgment for the moving party only where there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions, and affidavits. F.R.Civ.P. 56(c). When applying this standard, a court must view the factual record in the light most favorable to the non-movant. *Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at 248, 106 S.Ct. 2505.

For the reasons set forth below, this Court disagrees with defendants' arguments with one exception, and finds that there are disputed genuine issues of material fact here that preclude the entry of summary judgment for defendants with respect to each of plaintiff's claims on the bases asserted, except as to any claim for punitive damages against the state agency defendants. Other than this exception, defendants' motion for summary judgment is DENIED.

## DEFENDANT ADKINS' CLAIM OF QUALIFIED IMMUNITY

Defendant Adkins correctly points out that her claim of qualified immunity only serves to protect her from damages in her individual capacity, and does not have any impact on plaintiff's claims against her in her official capacity. (*See* Defendants' brief at 16, n. 5). If, however, plaintiff has failed to demonstrate any First Amendment violation as defendants argue, then all claims for relief against Defendant Adkins must be dismissed. Accordingly, the Court first addresses defendants' argument that plaintiff has failed to establish any violation of the First Amendment.

Plaintiff contends the defendants violated her First Amendment rights by retaliating against her for expressing her right to freedom of speech. " 'It is well established that a government employer may not condition employment or discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.' " *Curtis v. Oklahoma City Public Schools Board of Education*, 147 F.3d 1200, 1211 (10th Cir. 1998), quoting *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

■ In the context of public employees asserting claims under 42 U.S.C. § 1983 for violation of their First Amendment rights, the Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), established a four-pronged test for determining whether a government, acting as an employer, may restrict the speech of its employees. This test, as restated by the Tenth Circuit in *Hulen v. Yates,* 322 F.3d 1229, 1237 (10th Cir.2003) is as follows:

> The first step is to determine whether the speech is protected, i.e., on a matter of public concern. If so, the second step is to balance the employee's interest in commenting on matters of public concern against the government employer's interest in promoting efficient government services. If that balance is struck in favor of the employee's interest, the third step requires the employee to demonstrate that his speech was a substantial or motivating factor in the adverse employment action. If the employee so demonstrates, the fourth step considers whether the government employer has proven that it would have taken the same adverse employment action, even in the absence of the protected speech.

The first two steps determine whether the expression at issue is subject to the protection of the First Amendment, and as such, present legal questions to be resolved by the Court. *Gardetto v. Mason,* 100 F.3d 803, 811 (10th Cir.1996). The third and fourth steps, on the other hand, concern causation and involve questions of fact that must be resolved by the jury. *Id.*

### 1. *Is Plaintiff's Speech a Matter of Public Concern?*

As to the first step, the threshold question is whether the speech may be "fairly characterized as constituting speech on a matter of public concern," as opposed to speech upon matters "only of personal interest." *Connick, supra,* 461 U.S. at 146–47, 103 S.Ct. 1684. Thus, the present issue is whether plaintiff's communications to Mr. Heim of perceived intentional violations of fiscal rules on the part of Defendant Adkins was speech on a matter of public concern.

"Matters of public concern are those which can be fairly considered as relating to any matter of political, social, or other concern to the community. While speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern, speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Gardetto, supra* 100 F.3d at 812 (citations and internal quotations and brackets omitted). Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of the statements made, as revealed by the whole record. *Connick, supra,* 461 U.S. at 147–48, 103 S.Ct. 1684. "In deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Gardetto, supra,* 100 F.3d at 812. Individual personnel disputes, concerns with internal policies, or issues with supervisors typically fall under the personal grievance category. On the other hand, "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [government] officials, in terms of content, clearly concerns matters of public import." *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988).

Plaintiff here characterized her communications with Mr. Heim as a disclosure of

what she thought was a "cover-up" of illegal acts committed by Adkins (Gansert Depo. at 137, Exhibit 1 to plaintiff's responses). Plaintiff sought to inform CSLP's legal counsel, Mr. Heim, about what looked to her like "a deliberate attempt to circumvent the law." (*Id.* at 133). She contends her motivation to speak to Mr. Heim was based on the fact that he was her supervisor, and that he could shed light on the legality of Adkins' actions. It is important to note that Ms. Gansert, although having discovered as many as thirty fiscal rule violations in the past, responded differently to this particular violation (*id.* at 186–87). Although she usually would conduct a simple investigation and seek ratification of the financial commitment from the State Controller, this violation prompted her to contact her supervisor and legal counsel, Mr. Heim, because she perceived it to be an instance of an "illegality" and because it involved the director of CSLP (*id.* at 149, 187). These facts, for purposes of this motion, implicate matters of public concern because they involve questioning the integrity of public officials. Plaintiff raised nontrivial issues of potential "corruption, impropriety, or other malfeasance" on the part of government officials.

Defendants nonetheless contend that plaintiff's communications cannot be held to be on matters of public concern. First, they argue that the context in which plaintiff made the statements to Mr. Heim, that is making the disclosure only in her capacity as the State Controller Delegate for CSLP, necessitates a finding that she was not acting as a member of the general public, but rather in her status as an employee. (Defendants' brief at 21–23). Defendants' rather remarkable position, distilled to its essence, appears to be that when a public employee makes a communication only as part of his or her job, the employee loses the protections of the First Amendment. This is not a correct statement of First Amendment law in a government employment context.

Although plaintiff's expressions did take place during and as part of her official duties, her speech did not address matters of mere personal interest, such as working conditions or internal personnel policies. Instead, her speech was focused on what appeared to be deliberate and illegal conduct of CSLP management. Nothing suggests that her communication was an attempt to air personal grievances about her employment situation. Rather, plaintiff's disclosures pertained to a public agency's discharging of its governmental responsibilities.

This case is similar to the situation in *Curtis v. Oklahoma City Public Schools Board of Education, supra.* The Tenth Circuit held in *Curtis* that the plaintiff's speech concerning issues of racial equity in the local public school system involved a matter of public concern. 147 F.3d at 1212. In reaching this conclusion, the Court found that "[a]lthough the expressions took place during and as part of his official duties, Plaintiff's speech did not address matters of mere personal interest, such as working conditions or internal personnel policies." *Id.* Similarly, in *Patrick v. Miller,* 953 F.2d 1240, 1248 (10th Cir. 1992), the court found that the plaintiff's statements regarding potential misuse of municipal retirement funds to be a matter of public concern, even though the statements were made at a meeting of the trustees of the retirement fund, stating "as trustee of the retirement fund, Patrick had a duty to inform Board members of what he perceived to be improper conduct." *Id.*

█ Second, defendants argue that since plaintiff made the statements only "internally" to Mr. Heim rather than in a public "forum," the statements are not matters of public concern (Defendants' brief at 23). The fact that the communica-

tion occurred in a private conversation with Mr. Heim, as opposed to being revealed in a public disclosure, is not determinative. It is well established that public employees speech may be considered to be of public concern whether the speech was made in a public forum or in a private conversation with the employer. As the Supreme Court stated long ago in *Givhan v. Western Line Consol. School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979):

> The First Amendment forbids abridgment of the "freedom of speech." Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.

439 U.S. at 415, 99 S.Ct. 693. *See also, Rankin v. McPherson,* 483 U.S. 378, 387 n. 11, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) ("The private nature of the statement does not, contrary to the suggestion of the United States ..., vitiate the status of the statement as addressing a matter of public concern."); and *Conaway, supra,* 853 F.2d at 797 ("The fact that Conaway chose a private forum, rather than public, to express his concerns, does not remove it from First Amendment protection."). Defendants' argument on this point, to the extent it is being correctly understood by the Court, is at best borderline frivolous.

For the reasons stated, this Court finds, under the first step of the four-step analysis described above, that plaintiff's statements to Mr. Heim constituted expressions of public concern subject to the protections of the First Amendment.

The defendants have not argued that under the balancing of interests test, the second step of the four step process, the balance should be struck in favor of the employer and against the plaintiff. No balancing may be necessary at all here, as plaintiff made her disclosures internally and did not seek to publicize them. (Had she done so, it might have been contrary to the interest of the employer.) Because plaintiff made her disclosures only internally, there is no evidence of disruption to the employer's activities that is the hallmark of the balancing test that suggests the disclosures are not entitled to protection. *See, e.g., Finn v. New Mexico,* 249 F.3d 1241, 1249 (10th Cir.2001) (defendant must demonstrate "actual disruptions" arising from plaintiff's exercise of speech activities). The balance of interests, therefore, must be struck in favor of the plaintiff in this case based on the manner of her disclosure.

Thus, this Court finds that given plaintiff's expressions of public concern, and the balance of interests in her favor, she has established a sufficient First Amendment claim to present to a jury, and that a jury could reasonably find that plaintiff suffered retaliation for making the statements. Accordingly, this Court will not enter summary judgment against plaintiff on the basis that she has failed to produce enough evidence to entitle her to a jury trial on this claim.

2. *Was the First Amendment Right Asserted By Plaintiff "Clearly Established"?*

Defendant Adkins claims that even if plaintiff has demonstrated a violation of her First Amendment rights, the specific violation in question was not "clearly established," and therefore Defendant Adkins is still entitled to the protection of her qualified immunity.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a

reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In resolving cases in which a defendant claims qualified immunity, the Court must first consider whether the facts, taken in a light most favorable to the party asserting injury, show the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Here the Court has found such a potential violation.

■ If the Court finds a violation, it must next determine whether that right was clearly established at the time of the alleged violation. *Id.* A right is considered to be "clearly established" if Supreme Court or Tenth Circuit case law exists on point, or if clearly established weight of authority from other circuits has found a constitutional violation from similar actions. *Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir.1999). Defendants argue that in order for plaintiff to show that her alleged right was clearly established, she must "put forward specific precedent demonstrating that the constitutional right allegedly violated by Ms. Adkins was clearly established," and that the precedent must hold that when an individual "raises an issue internally concerning the propriety of a commitment for an expenditure of governmental resources, as part of their employment responsibilities," that activity is protected by the First Amendment. (Defendants' brief at 24–25). This Court does not agree that such an exact "fit" is required to show that a constitutional right is clearly established. As recently stated by the Tenth Circuit in *Peterson v. Jensen*, 371 F.3d 1199, 1202 (10th Cir.2004), in describing the parameters of a "clearly established" precedent:

"This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ." The threshold test is simply whether "in light of pre-existing law the unlawfulness [is] apparent." *Id.*, citing to *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ The unlawfulness of retaliating against or terminating a public employee who reports, even internally and privately, some evidence of ostensible corruption, impropriety, or other integrity lapses on the part of government officials, was apparent in April 2003 from the well-established law contained in the several cases cited above.[3] Defendant Adkins' motion for summary judgment based on her assertion of the protection of qualified immunity is therefore DENIED.

## DEFENDANTS' ARGUMENTS UNDER THE COLORADO STATE EMPLOYEE PROTECTION ACT

■ This statute provides, in pertinent part, that "no appointing authority or supervisor shall initiate or administer any disciplinary action against an employee on account of the employee's disclosure of information." C.R.S. § 24–50.5–103(1). This provision does not apply, however, to "[a]n employee who discloses information from public records which are closed to public inspection pursuant to section 24–72–204." C.R.S. § 24–50.5–103(1). The statute further provides that

(2) It shall be the obligation of an employee who wishes to disclose information under the protection of this article to make a good faith effort to provide to his supervisor or appointing authority or

---

3. Whether plaintiff was "terminated" as she alleges, or she "chose to retire" as defendants assert, is immaterial for purposes of this motion. It is apparent from the memorandum written by Defendant Adkins on April 9, 2003 that some adverse employment action occurred. (Ex A–53 to Defendants' brief).

member of the general assembly the information to be disclosed prior to the time of its disclosure. (Emphasis added.)

C.R.S. § 24–50.5–103(2). Supervisor is defined in the statute as "any board, commission, department head, division head, or other person who supervises or is responsible for the work of one or more employees." C.R.S. § 24–50.5–102(5).

Plaintiff alleges that her discussions with Mr. Heim constitute a disclosure of information under the statute,[4] that the actions of Defendant Adkins constitute disciplinary action against her and that she is entitled to damages under C.R.S. § 24–50.5–105, which permits such a disciplined employee to bring a civil action.

In their motion for summary judgment defendants first assert, as indicated above, that prior to plaintiff's disclosure to Mr. Heim of the information regarding the two purchase orders, she "made absolutely no effort whatsoever to disclose such information to Ms. Adkins or any member of the Colorado General Assembly." (Defendants' brief at 27). They argue that she therefore failed to "make a good faith effort to appraise [sic] either her supervisor, her appointing authority, or a member of the General Assembly" which they assert is required to comply with C.R.S. § 24–50.5–103(2).

This Court agrees with defendants that compliance with C.R.S. § 24–50.5–103(2) is required, but disagrees with defendants that plaintiff failed to comply. Defendants read the statutory provision too narrowly. With respect to plaintiff's position with the CSLP, Ms. Adkins was not her only "supervisor." The definition of "supervisor," quoted above, includes any other person who supervises or is responsible for the work of one or more employees.

In her deposition, plaintiff gives her reason for seeking Mr. Heim's advice as that she "thought Mr. Heim was my supervisor in these matters." (Gansert Depo. at 145). She further stated that as the attorney general delegate for the State Controller's review of contracts, he supervised such fiscal matters as the purchase order involved here to the extent that he would give counsel as to what could and could not be approved (Id. at 146). Within the logical meaning of the statute, Mr. Heim, as the attorney assigned to advise plaintiff in conjunction with her State Controller delegate functions, constitutes a "supervisor," or at least there is a genuine issue of material fact as to whether he was her supervisor. Plaintiff took the information to Mr. Heim, whom she understood to have supervisory authority within that agency, and therefore this Court cannot say based on the current state of the record, that she failed as a matter of law to satisfy the purpose of the "good faith" provision.

While a lawyer is generally referred to as an agent to the client, legal counsel for a government agency may well have authority or responsibility over the work of lower-level employees, atypical of a traditional lawyer-client relationship. Here, Mr. Heim testified that his role at CSLP was akin to that of "general counsel" and that his function included answering questions on compliance issues. (Heim Depo. at 15, 27). Moreover, pursuing the "lawyer as agent" theory further, it is at least arguable that Mr. Heim was wearing the hat of agent for plaintiff's supervisors

---

4. Although the statute defines "disclosure of information" as the "written provision of evidence to any person," C.R.S. § 24–50.5–102(2), the Colorado Supreme Court held in *Ward v. Industrial Commission,* 699 P.2d 960, 967 (1985), that "the legislature did not intend to exclude oral or verbal disclosures from protection. Protection should not depend upon the means or method of disclosure."

when she informed him of the perceived wrongdoing in question, thus satisfying the "good faith" requirement by reporting to a supervisor through the CSLP's legal representative. In any event, this factual dispute, which may have to be resolved by the jury, precludes entry of summary judgment at this stage of the case.

■ In their motion for summary judgment defendants also assert, as indicated above, that plaintiff's disclosure is not protected under the whistleblower statute because the "disclosure of the information concerning the two purchase orders she believed violated the State Fiscal Rules and Colorado law to Mr. Heim occurred during the investigation of the matter under the auspices of the Office of the State Controller." (Defendants' brief at 28.) They argue that such a disclosure is exempt from protection under the statute because it involved disclosure of public records closed to public inspection under C.R.S. § 24–72–204, a provision of the Colorado Open Records Act (*id.* at 28–29). The defendants cite to C.R.S. § 24–72–204(2)(a)(I) as the provision which closes the records to public inspection, urging that the information constitutes "investigatory files compiled for any other law enforcement purpose." (Defendants' brief at 29.)

This Court disagrees with defendants' reading of the statutory provisions in several respects. First, the exemption in the Whistleblower Act, on which defendant relies, states that the disclosed information is not protected if it comes from "public records which are closed to public inspection" pursuant to the Open Records Act. While the provision from the Open Records Act upon which defendants rely states that "the custodian may deny the right of inspection of the following records ...," C.R.S. 24–72–204(2)(a) (emphasis added), there is no evidence here that the custodian of the "records" did in fact deny the

right of inspection, and therefore there is no evidence to believe the "records" were closed to public inspection.

Second, even if it were sufficient that the cited provision of the Open Records Act could render the records closed to the public, it is not clear that the information disclosed by plaintiff constituted "investigatory files compiled for any other law enforcement purpose," as defendants suggest. The information plaintiff disclosed was the contents of two purchase orders, and apparently the fact that they had not been previously approved. In similar contexts courts have distinguished between documents submitted to a government agency as a matter of routine (which are subject to inspection) and the work product or strategies of investigators in the process of an investigation (which are not subject to inspection). *See, e.g., Denver Publishing Co. v. Dreyfus*, 184 Colo. 288, 294, 520 P.2d 104, 107 (Colo.1974) (holding, under a predecessor statute, that an autopsy report itself is not an investigatory record, even though the report may relate to an ongoing investigation by the coroner). Thus, although documents which are investigatory for a law enforcement purpose may be closed to public inspection, the documents plaintiff relied on in her disclosure to Mr. Heim do not fall into this category, regardless of whether or not the documents themselves prompted an investigation.

Third, notwithstanding what defendants state in their brief, the disclosure made by plaintiff to Mr. Heim on January 24, 2003 was not a disclosure of the State Controller's investigation files. Under the undisputed facts set forth above, it is clear that "investigation" by the State Controller commenced some time after plaintiff's disclosure to Mr. Heim on January 24, 2003.

■ In their reply brief, defendants appear to advance yet another argument as

to why plaintiff's disclosures are not protected under the statute. They argue that if, as plaintiff claims in her response, Mr. Heim was her supervisor and her presentation of the information to him satisfies the employee's "good faith effort" requirement to first provide the information to her supervisor, plaintiff made no protected disclosure under the statute because she did not disclose the information to anyone else (Defendants' reply brief at 30–31). Defendants thus read a "two disclosure" or a "disclosure to a non-supervisor" requirement into the language of the statute.

The problem with defendants' argument is that if it were correct, it would undermine a major purpose of the statute, namely to protect an employee from retaliation by the supervisor to whom the information is first disclosed. Under defendants' reading, if an employee made a "good faith disclosure" to a supervisor, as required under C.R.S. § 24–50.5–103(2), and the supervisor then fired the employee for making the disclosure, the employee would not be protected, as she would have made no second disclosure. Such an interpretation flies in the face of the primary language of the statute which prohibits a supervisor from initiating or administering "any disciplinary action against an employee on account of the employee's disclosure of information." C.R.S. § 24–50.5–103(1). Moreover, such an interpretation would contradict the very purpose of the statute as expressed in the legislative declaration:

> The general assembly hereby declares that the people of Colorado are entitled to information about the workings of state government in order to reduce the waste and mismanagement of public funds, to reduce abuses in government authority, and to prevent illegal and unethical practices. The general assembly further declares that employees of the state of Colorado are citizens first and have a right and a responsibility to behave as good citizens in our common

efforts to provide sound management of governmental affairs. **To help achieve these objectives, the general assembly declares that state employees should be encouraged to disclose information on actions of state agencies that are not in the public interest and that legislation is needed to ensure that any employee making such disclosures shall not be subject to disciplinary measures or harassment by any public official.** (Emphasis added).

C.R.S. § 24–50.5–101. Thus, this Court rejects the interpretation of the statute offered by defendants and finds that plaintiff has come forward with sufficient evidence to demonstrate that she is entitled to a trial on her claims under the Whistleblower Act.

## DEFENDANTS' ARGUMENTS AS TO PLAINTIFF'S ECONOMIC DAMAGES CLAIMS

Defendants also argue in their motion for summary judgment that any economic damages sought by plaintiff in the form of lost earnings are limited by her annual renewable contract of employment with CSLP (Defendants' brief at 31–33). Although this argument is not properly brought as a motion for summary judgment, in that defendants do not seek judgment on "all or any part of a claim" for relief as required under Rule 56(b), nor do the arguments as framed by defendants ask for specific relief, nor has a *Daubert* motion been filed, the Court will address the arguments raised in this section of defendants' motion for purposes of clarifying these matters for trial.

Defendants' argument on this issue emanates from the report of plaintiff's listed economic damages expert, Dr. Pat Pacey, who has apparently calculated plaintiff's lost earnings and benefits for a period of 9.5 years following plaintiff's separation from her position. Defendants assert that

assuming plaintiff would have continued to work at CSLP in the same capacity for an additional 9.5 years, or until 2013, results in "damages at an exorbitant amount" and is "no more than speculation." (Defendants' brief at 31, 33). Defendants further argue that such a scenario is particularly speculative here, as plaintiff was employed under a one year contract that was not subject to automatic renewal. Defendants apparently are asking this Court to rule that plaintiff's lost earnings are limited to those she would have earned under her existing contract. This Court declines to do so for the following reasons.

### 1. *Issues for the jury to determine*

As a preliminary matter, the Court addresses defendants' argument that any determination of "back pay" or "front pay" damages in this case will be made by the Court and not by the jury. (*See* Defendants' brief at 31, n. 10). Notwithstanding how the defendants may understand these terms, this Court, for purposes of clarity, defines "back pay" as that which may be awarded as damages from the time of termination to the time of judgment, and "front pay" as that as that which may be awarded from the time of judgment into some future period, as an alternative if reinstatement is not ordered.

■ This Court agrees with defendants that in a case brought under 42 U.S.C. § 1983, an award of "front pay" as defined above, is a matter for the court to decide. *See, e.g., Ballard v. Muskogee Regional Medical Center,* 238 F.3d 1250, 1253 (10th Cir.2001) ("An award of front pay for claims under § 1983 is an equitable remedy; thus, the district court has discretion to decide whether such an award is appropriate."); *Starrett v. Wadley,* 876 F.2d 808, 824 (10th Cir.1989). If plaintiff prevails on either of her two claims at trial, this Court, and not the jury, will determine post-verdict whether she is equitably entitled to reinstatement, or alternatively to "front pay," or some other relief.

■ This Court, however, does not agree with defendants that the law is the same on the issue of whether "back pay" in a § 1983 case should be decided by the court or by the jury.[5] First, § 1983 has generally been construed to provide for a variety of compensatory damages to be awarded by juries to plaintiffs deprived of their civil rights under color of law. Such compensatory damages can include out-of-pocket loss and "other monetary harms", as well as damages for impairment of reputation, personal humiliation, mental anguish and suffering, and mental and emotional distress. *See Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) and cases cited therein. Wages or benefits lost by an employee terminated in violation of her constitutional rights would seemingly be but one category of these allowable compensatory damages.

Here, defendants suggest that "back pay" is somehow different. In their reply brief defendants admit that the Tenth Circuit has not specifically decided that back pay is an equitable remedy under § 1983, but argue that it has been so determined under Title VII and the Americans with Disabilities Act (Defendants' reply at 36, n. 8). Defendants contend that since back pay under Title VII is an equitable remedy tried to a court and not to a jury, so it should be under § 1983. Defendants have cited no authority to support their proposi-

---

5. At least for purposes of this argument as to economic damages, the defendants do not appear to argue there is any difference between plaintiff's claim under § 1983 and her claim under the Whistleblower Act. Certainly back pay is an available remedy under the Whistleblower Act. *See Lanes v. O'Brien,* 746 P.2d 1366, 1373–74 (Colo.App.1987).

tion other than cases decided under Title VII.

This Court has not found Tenth Circuit authority expressly holding that the determination of back pay in the context of a § 1983 case is a matter for the jury. However, there is Tenth Circuit precedent under 42 U.S.C. § 1981, a similar civil rights statute, expressly holding that the issue of back pay is for the jury to decide under that statute, and the fact that back pay under Title VII is "equitable" does not require a contrary result. In *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439 (10th Cir.1988), the plaintiff sought back pay under both Title VII and § 1981. The court distinguished the back pay remedies available under these respective statutes, holding that back pay was "equitable" under Title VII and the claimant was not entitled to a jury trial on such claims, but also holding:

> A claimant who establishes a cause of action under § 1981, however, can recover both compensatory and punitive damages, as well as backpay and lost benefits for an unlimited period of time. [Citation omitted]. Since these remedies have been characterized as legal in nature, a claimant is entitled to a jury trial on his § 1981 claim.

859 F.2d at 1443. While this case is not determinative on the issue of a jury trial for a § 1983 back pay award, it plainly rejects the notion that Title VII procedures necessarily determine whether a jury trial is available under other civil rights statutes.

Moreover, although not explicitly raised as an issue in the cases, there are a number of reported decisions where back pay awards have been made by a jury in § 1983 cases where the plaintiff alleged termination or adverse employment action in violation of the First Amendment. *See, e.g., Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112 (10th Cir.2004) ("On

Special Verdict Form (SVF) 1A, the jury determined that Ms. Hardeman's protected speech was a motivating factor in the Mayor's decision to discharge her. The jury awarded back pay of $236,432."); *Mason v. Oklahoma Turnpike Authority*, 115 F.3d 1442, 1457 (10th Cir.1997) ("The jury awarded Mason $185,572.70 in compensatory damages, an amount exactly equal to the back pay Mason requested."); *Starrett v. Wadley, supra*, 876 F.2d at 824 (jury awarded $75,000 as compensatory damages). Even in *Stachura, supra*, where the Supreme Court held that compensatory damages could not be awarded solely for the abstract "value" or "importance" of constitutional rights the violations of which were vindicated under § 1983, it noted without comment that the plaintiff's claim for "lost earnings" had been submitted to the jury. 477 U.S. at 302, 106 S.Ct. 2537. The results reported in these cases support submission of back pay requests under § 1983 cases to determination by the jury.

Accordingly, in the instant case plaintiff's claims for compensatory damages under § 1983, including any claim for lost wages and benefits through the time of trial, will be submitted to the jury.

### 2. *The relevance of plaintiff's employment agreement*

■ As a general practice, a jury deciding damages based on lost earnings and benefits in a case involving wrongful termination of an employee-at-will would be permitted to award any amounts an employee probably had or would have incurred. *See, e.g., Colorado Jury Instructions*, 4th (Civil) 31:14. There is no reason to diverge from that principle here, despite the fact that plaintiff was an employee under a fixed-term contract that was subject to renewal. While the precise issue may not have been determined in a § 1983 case,

Title VII employment cases provide guidance on this issue.

In *Walker v. Ford Motor Company*, 684 F.2d 1355 (11th Cir.1982), the Court of Appeals found that the district court erred in ruling that plaintiff's damages for a racially discriminatory hiring practice would be limited to the fixed term of his training contract. The court held that "[t]he mere fact that the training agreement was for a fixed term did not automatically end Ford's liability. On the contrary, our cases have recognized that even employees hired for fixed terms may be entitled to backpay from the date of the adverse employment action until reinstatement." 684 F.2d at 1361. The *Walker* decision established an allocation of proof in such cases, holding that a plaintiff must initially introduce some evidence showing that the economic injury resulting from the discharge extended beyond the employment period. *Id.* at 1362.

The approach outlined in *Walker* was quoted at length and followed in the recent decision in *Keller v. Board of Education of Albuquerque*, 182 F.Supp.2d 1148 (D.N.M. 2001). In describing the burden of proof placed upon the employee seeking damages beyond the fixed term contract period, the court stated that:

> As in the teacher discharge cases, this proof may consist of no more than a showing that the particular plaintiff's contract had been renewed in the past, that contracts of similarly situated employees had been renewed, or that the employer had made a promise of continued employment. Once the plaintiff carries this burden, and thus ... establishes the damages resulting from the discriminatory acts, then the burden shifts to the defendant to show by a preponderance of the evidence that the

plaintiff would not have remained in employment beyond the contract term.

182 F.Supp.2d at 1162.

This Court, therefore, disagrees with defendants that plaintiff's annual renewable contract limited the economic damages for lost earnings that should be submitted to the jury. Whether plaintiff can meet her burden of coming forward as described above, and if so, whether the defendants can show by a preponderance of the evidence that her contract would not have been renewed for other reasons, are factual matters that must be determined before the jury, and which will affect whether the damages scenario assumed by plaintiff's expert is supportable.

This Court thus sees no basis to enter any orders at this time regarding plaintiff's "economic damages" solely on the basis that plaintiff was employed under renewable annual employment contracts, as requested by defendants.

**PLAINTIFF'S PUNITIVE DAMAGES CLAIMS**

 Defendants' contend that plaintiff may not recover punitive damages against the state defendants on her claim under the Whistlelower Act. Plaintiff does not appear to take issue with this argument. The Court agrees that the state agency defendants cannot be held liable for punitive damages. *See* C.R.S. § 24–10–114(4).

 Defendants also contend that there is insufficient evidence as a matter of law to support any punitive damages claims against Defendant Adkins under either the § 1983 claim or under the Colorado statutory claim. They assert that "no reasonable jury ever could conclude Ms. Adkins acted either evilly, or maliciously to violate the Plaintiff's constitutional rights or willfully and wantonly to violate Plaintiff's statutory rights under Colorado law." (Defendants' brief at 35.) Such a determi-

**1232**

nation cannot be made at this juncture, but rather depends on the evidence put before the jury. This issue, therefore, cannot be prematurely decided on a motion for summary judgment.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Dkt.# 62) is DENIED, except that plaintiff cannot recover punitive damages on her Whistleblower Act claim against the state agency defendants.